UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SCOTT EDGAR DYLESKI,

    Petitioner,

    v.

RANDY GROUNDS, et al.,

    Respondents.

Case No.  12-cv-05336-SI

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS IN PART
AND STAYING ACTION**

United States District Court
Northern District of California

     Scott Edgar Dyleski ("petitioner"), a prisoner currently housed at California State Prison Corcoran, filed the present petition before the Court challenging his 2005 state court conviction. Petitioner seeks a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The Court has carefully reviewed and considered petitioner's request.  Petitioner's ineffective assistance of counsel (trial and appellate), prosecutorial misconduct, and cumulative error arguments are DENIED for the reasons that follow.  The Court will STAY the action so that petitioner may return to state court to assert his unexhausted challenges to his sentencing.

**BACKGROUND**

**I.**    **The Crime**

     Petitioner was convicted in Contra Costa County Superior Court of first degree murder and was found to have committed the murder while engaged in the commission or attempted commission of residential burglary.  He was sentenced to life in prison without the possibility of parole ("LWOP").  The following factual background is taken from the order of the California Court of Appeal:

     Defendant was charged by information with murder (Pen. Code, [FN1] § 187) and

first degree residential burglary (§§ 459, 460, subd. (a)).  The information further alleged that during the commission of the murder, defendant personally used a bludgeon (§ 12022, subd. (b)(1)) and was engaged in the commission or attempted commission of residential burglary (§ 190.2, subd. (a)(17)).  The information also alleged that defendant was at least 16 years old when the offenses were committed (Welf. & Inst.Code, § 707, subds. (b), (d)(1)).

> FN1.  All statutory references are to the Penal Code unless otherwise indicated.

## A. *Prosecution Case*

### 1. *The Murder*

On the morning of Saturday, October 15, 2005, Daniel Horowitz left his home at 1901 Hunsaker Canyon Road in Lafayette shortly before 8:00 a.m. to attend a meeting.  Horowitz was an attorney who was at that time defending Susan Polk in a criminal case that was being widely covered in the local media.  Horowitz's wife, Pamela Vitale, was still asleep when he left.

Horowitz attempted to call Vitale periodically during the day, but she did not answer the telephone.  He left his office late in the afternoon that day, ran some errands, worked out at the gym, and stopped at a grocery store on the way home.  When he pulled into the driveway, Horowitz was surprised that Vitale's car, a white Mercedes sedan, was still there.  He knew she had plans to attend a ballet that evening and had assumed she would have left the house by that time.  Horowitz retrieved the groceries and his computer bag from the trunk of his car and walked to the front door.  The door was closed and Horowitz noticed smears on it.  He opened the front door and saw Vitale lying there.  It was obvious to him from her appearance and the amount of blood he could see that she was dead.  He dropped his computer and groceries, and fell to the floor, screaming.  He called 911 from inside the house and then returned to Vitale's body and cried and screamed.  Neighbors later recounted hearing Horowitz's screams about 6:00 p.m.

### 2. *Vitale's Injuries*

Dr. Brian Peterson, who conducted the autopsy of Vitale, opined that she died as a result of blunt force trauma to her head.  The vast majority of Vitale's external injuries were abrasions (scrape-type injuries) and lacerations (crushing or tearing-type injuries) caused by blunt force, many on the victim's head.  While it was difficult to estimate how many blows Vitale suffered because of possible overlap, Peterson was able to identify eight distinct injuries on the right side of Vitale's head, 11 on the back of her head, and seven on the left side of her head.  Vitale's head lacerations, while in many cases separating her scalp and exposing bone, did not cause any skull fractures.  Vitale's internal injuries as a result of the blows to her head consisted of bleeding inside her scalp and over virtually every surface of the brain.

Vitale suffered other injuries to her head and neck.  There was bleeding in one of her neck muscles, consistent with impact on the skin.  She sustained a bone fracture to her nose, and two of her teeth had broken loose from her upper jaw.  Peterson opined that most of Vitale's head and neck injuries were sustained as her face was forced hard against the carpet while blows were inflicted to the back of her head.  She had abrasion-type injuries to her left knee that could have been caused by an abrupt fall from a standing to a kneeling position.  There were also contusions, abrasions, and scratches to Vitale's shoulders, breasts, and upper

2

torso, fractures to her left hand that caused the bone to be exposed, and bruising on her right foot, which Peterson concluded were probably defensive injuries. The injuries to the right foot were most likely sustained while the victim was on the floor "trying to get anything between her and the force being inflicted."

Peterson opined that the weapon used to inflict the observed blunt force injuries was most likely a smaller, irregularly shaped, hard object such as a rock, which was applied to the victim's body with a moderate amount of force. A longer or heavier object such as a golf club or baseball bat would most likely have caused skull fractures. Peterson opined that the perpetrator, even if wearing gloves, might have also sustained injuries such as bruising and swelling of the hand in applying the force necessary to cause Vitale's injuries.

Vitale suffered two further injuries not caused by blunt force trauma. Peterson observed what he described as "three intersecting superficial incisions" on the victim's back consisting of two horizontal incisions, each approximately four inches in length, both intersected by a four and one-half inch vertical incision, forming an H-shape. The incisions were made while blood was still circulating in Vitale's body. Vitale also suffered a deep abdominal stab wound that penetrated her stomach and small bowel. Peterson believed the stab wound was inflicted shortly after or just before Vitale died.

Dr. Peterson opined that Vitale would have died within minutes as opposed to hours after the first blows were struck to her head.

### 3. *Crime Scene Evidence*

Alex Taflya, a criminalist with the Contra Costa County Sheriff's Department Crime Lab, arrived at 1901 Hunsaker Canyon Road at about 9:15 p.m. to process the crime scene and collect evidence.

Taflya observed blood on the floor and the walls near Vitale's body. An overturned plastic storage bin lid lay by the front door. There was a shoe print in blood on top of the lid. There was also a fabric print on the bin consistent with having been made by a glove. Taflya also observed blood smears on the interior portion of the door that he opined were consistent with someone who was wearing a long-sleeved garment. Vitale was found in a short-sleeved T-shirt. Blood spatter on the interior of the front door led Taflya to conclude that the door was closed during the attack. Based on the location of the great majority of blood evidence, Taflya opined that most of the victim's injuries were sustained while she was low to the ground in the entry way. The sock on Vitale's right foot had separated, leaving the foot exposed. Contact transfers below the front door knob were left by Vitale's bare foot.

On the walls and on objects in the room there were numerous finger marks in blood; some of these contained fine linear striations, indicating they were fabric patterns rather than fingerprints, consistent with the attacker wearing gloves throughout the incident. Taflya later looked at photographs of a glove which, based on its finely knit construction, could not be ruled out as the source of the fabric prints found at the scene.

Taflya observed a "fairly heavy" flashlight near the entryway, which was covered in blood, as well as a smaller flashlight with blood contact transfers. He believed the flashlights could have been used to inflict some but not all of Vitale's injuries. Taflya also identified various pieces of molding found at the scene that contained blood stains. Taflya opined that these pieces might have been used to strike the

victim, but they could not have been used to strike more than one or two blows and were not the murder weapon.

In the kitchen, Taflya found an opened water bottle and bowl on the counter that had blood on them.  There was also blood found on a mug in the sink.  In the hallway bathroom, Taflya observed a hand swipe in blood on the far wall and contact transfers on the shower curtain and hot water knob of the shower.  He opined that nobody operated the shower after the blood smears were left because the smears would have been diluted or washed off.

### 4. *Defendant's Background*

Defendant was two weeks short of his 17th birthday at the time of Vitale's murder.  He and his mother, Esther Fielding, had lived a short distance from Horowitz and Vitale's residence, at 1050 Hunsaker Canyon Road, since approximately 1999.  They had come to live there at the invitation of Fred and Kim Curiel, who had been living in a small trailer on the property with their three children since 1998.  The Curiels began construction of a home on the property in August 2002.  Until the house was completed, defendant and his mother lived in a plywood lean-to the Curiels built for them to provide shelter from the weather.  Defendant, Fielding, and the Curiels moved into the completed house in April 2003.

In August 2002, defendant's half-sister died in a car accident.  He never lived with his half-sister, but he would see her on visits to his father.  After his sister's funeral, defendant began wearing black consistently, and would go to school in costumes, using different styles of black hats and stockings, and wearing make-up and black nails and black lipstick.  [FN2]  Defendant's grades fell to D's and F's.  His mother described him as being very sad, and Kim Curiel testified that he was "quite sullen."

> FN2.  Fielding had once owned a costume shop in Hayward.  Defendant had enjoyed wearing costumes of all kinds when he was younger, some of them made by Fielding, who was a skilled seamstress.

Defendant left high school after his sophomore year and was getting his general education development (GED) certificate during the summer of 2005, so that he could attend Diablo Valley College in the fall.  During that summer, he "almost always" dressed in black and wore black nail polish.  About three weeks before Vitale was murdered, defendant started taking walks in the woods, which was something he had not done before.  He told Kim that he would walk out to the barn, up to the hills, or down to the mailboxes.

The jury was shown a collection of writings and artwork produced by defendant that assertedly reflected his interest in violent subject matters and feelings of separateness.  One writing was entitled "Live for the Kill."  The words "Style Gothic, hate" were written under the title.  Other writings used words such as "Separation," "lonely," and "set apart."  His drawings included a rendering of a man holding a severed head and a knife with red coloring, a depiction of a face with the mouth apparently stitched up with X's, and a drawing containing a razor blade, swastika, and a knife.  The latter drawing contained the words, "Just like Jesus Christ, just like fun with knives, just like roses red, just like roses dead."  Another drawing depicted a male subject in a long coat with a knife, containing the words, "Guns don't kill people.  I kill people."  Another depicted dark figures lying down among flowers with the words, "Before Manson, before Bundy, there was Gein."   Some drawings and writings included symbols containing

United States District Court
Northern District of California

intersecting horizontal and vertical lines.

Defendant's mother testified that a week or two before the Vitale murder she had found a drawing defendant had made that included body parts.   She was concerned enough about the drawing when she found it that she thought he should see a therapist.

Defendant's girlfriend, Jena Reddy, testified that she and defendant experimented with pain in their sexual relationship to the point that she believed, at the time, that they were both sadomasochists.   She also testified that they had discussed torturing children and that defendant was interested in Jack the Ripper and discussed with her that Jack the Ripper had removed body organs from his victims.

**5. *Credit Card Fraud***

Defendant and 16-year-old Robin C. had been close friends since the eighth grade.   Toward the end of the summer in 2005, defendant and Robin [FN3] began discussing a plan to grow marijuana.   Defendant came up with the idea of using stolen credit card information to pay for the growing equipment they needed.   At some point they discussed making a specific purchase of an item from a Web site called "VaporWarez" that sold marijuana smoking devices.   Robin and defendant selected a vaporizer device costing $267 that defendant ordered from the VaporWarez Web site on September 17, using credit card information he had stolen from John Halpin, a neighbor of defendant's who lived at 1701 Hunsaker Canyon Road.   About two weeks later, defendant brought the vaporizer over to Robin's house where it remained until it was turned in to police by Robin's father after Vitale's murder.   A VaporWarez invoice showed that the September 17 vaporizer purchase had been billed to Halpin at 1701 Hunsaker Canyon Road, but the ship-to name and address for the order were listed as Esther Fielding at 1050 Hunsaker Canyon Road.   Halpin testified that he was out of state between September 16 and October 23.

FN3.  We use first names for purposes of clarity, not out of disrespect.

A couple of weeks before Vitale's murder, defendant and Robin exchanged e-mails in which Robin identified the lighting and hydroponic equipment they would need to grow marijuana in defendant's closet, and the online sites from which to order them.   Robin warned defendant to keep the amount ordered on each credit card small to avoid detection, and defendant responded that "stealthiness is the number one priority."   However, part of the plan was to use defendant's address as the delivery address for the equipment.   A few days before Vitale's murder, defendant placed orders for the equipment as discussed.

Karen Schneider lived next door to Horowitz and Vitale at 2001 Hunsaker Canyon Road.   She did not know defendant but was on friendly terms with the Curiels.   On Thursday, October 13, Schneider reviewed her bank and credit card accounts online and noticed that there were three charges she had not approved from a company named Specialty Lighting.   Schneider sent an e-mail to Specialty Lighting shortly after 10:00 p.m. Eastern Standard Time on the 13th, after finding its Web site on the Internet.   Specialty Lighting's owner, Jackie Jahosky, responded to Schneider by e-mail at 10:20 a.m. Eastern Standard Time the next morning and faxed copies of the orders to her.   The first order was placed on October 13 at 12:15 a.m. Eastern Standard Time.   The order was for a grow light system and was to be shipped to Esther Fielding at 1050 Hunsaker Canyon Road with an associated telephone number of (925) 962-0829, which was Fielding's

telephone number.  The order listed Karen Schneider as the party to be billed, with her address shown as 1901 Hunsaker Canyon Road, and an associated telephone number of (925) 283-8970.  These were the address and unlisted telephone number for the Horowitz-Vitale residence. [FN4]  The second order, for lighting equipment, was placed four minutes later using the same e-mail address and shipping and billing information as the first order.  The third order, for cooling accessories, was placed eight minutes later, using the same information as the other two orders.  A fourth order was placed on the 13th using Esther Fielding's e-mail address and shipping address, but listing John Halpin as the party to be billed. [FN5]  Halpin later discovered another order charged to his credit card without authorization on October 13 by a company named Future Gardens for a liquid earth starter kit, hydro buckets, and pumps.  This order was to be shipped to Esther Fielding at 1050 Hunsaker Canyon Road and was billed to Halpin at his address using his credit card information.

> FN4.   The residents of Hunsaker Canyon Road had formed a road association.  The Curiels kept a list of the names, addresses, and telephone numbers of the road association members, including the unlisted Horowitz-Vitale telephone number, taped to the wall in their house.

> FN5.  The order was apparently placed using his credit card information.

Jahosky was suspicious of the Specialty Lighting orders because of their high dollar amounts and the fact that next-day air shipment was requested for the equipment, which added considerably to their cost.  She decided that she would not ship the merchandise and told Schneider that on the morning of Friday, October 14.  Jahosky also sent an e-mail on October 14 to the e-mail address listed on the orders—Esther Fielding's e-mail address—stating that the orders could not be processed.  At 2:21 p.m. Eastern Standard Time, Jahosky received a call from a male caller inquiring about the problem with the orders.  Jahosky was surprised by the call because in her experience persons who submitted fraudulent orders did not normally call, but would just try to place the order with another company.  The caller sounded young and seemed to Jahosky to be trying to disguise his voice.  Jahosky did not say anything to the caller about her suspicion the orders were fraudulent or her contact with Schneider.  Rather than telling him her real reason for not filling the orders, she told the caller she could not ship to an alternate address that was not the same as the billing address for the credit card.  The caller said, "Okay, that's fine," in a very polite fashion that Jahosky found to be "weird."

The caller called back at 3:54 p.m. Eastern Standard Time on the 14th.  This time, he asked if the merchandise could be shipped to the billing address on the orders.  In the second call, Jahosky told him the credit card company had declined the charges and he would need to contact the credit card company.  He accepted that information and did not make further contact with Jahosky.   According to telephone records, both calls originated from the Curiels' telephone number.

On October 14, defendant called Robin after school and told him that "some of it hadn't gone through and he was going to try to find a way to make it work."

### 6. *The Day of the Murder*

A forensic examination of Vitale's computer showed that it was used beginning at 8:07 a.m. on October 15 to visit several genealogical and news Web sites that were consistent with Vitale's interests.  The computer was used very extensively in the first part of the morning.  The last use was at 10:12 a.m. and there was no

further activity on the computer that day up until Vitale's body was discovered.

On the morning of October 15, Kim Curiel woke up around 8:30 a.m., did some chores, ate breakfast, and then sat on the couch and started grading papers. While she was grading papers, defendant walked through the front door. That was the first time Kim saw defendant that morning. Another resident of the house, Michael Sikkema, was in the kitchen making breakfast. Defendant walked with an exaggerated step, smiled broadly, and said in rather loud voice, "I had the most beautiful walk this morning."

Kim noticed that defendant's hands were shaking slightly. Defendant also had scratches on his nose that were actively bleeding and three or four small scratches on his cheek. He explained that he fell down on his walk as he was coming down the hill and got "whacked" by a bush. He told Kim he had been "looking for the waterfall that you guys had talked about." When Kim told defendant there was no water in October, he replied, "Yeah, I found that out."

After talking to defendant, putting some ointment on his nose, and grading one more paper, Kim left the house with Fred and two of their children, and drove to the Spirit Store to look at Halloween costumes. Based on transaction receipts from the Spirit Store and travel time, Kim estimated that defendant walked though the door around 10:45 a.m. on Saturday morning. A sheriff's detective determined that it would have taken approximately 10 minutes to walk from the Vitale-Horowitz residence to the location of an abandoned van on the 1050 Hunsaker Canyon Road property where articles of clothing linked by blood evidence to the attack on Vitale were later found. [FN6]

> FN6. The detective also timed the drive from 1050 Hunsaker Canyon Road to the vicinity of the Spirit Store, which took 21½ minutes. Credit card receipts established that the Curiels made a purchase at the Spirit Store at 12:36 p.m.

Sikkema, who was renting rooms in the Curiels' house with his wife and two children, went downstairs to make breakfast for his children about 10:20 a.m. on October 15. As he was making oatmeal, Sikkema noticed defendant walk in the front door at a time he estimated was close to but no later than 11:00 a.m. Sikkema saw gouge marks on defendant's cheek and nose that looked fresh and were not there the night before. Defendant told Sikkema he walked into a bush while walking on the trail toward the barn or waterfall. Esther Fielding came home from work around noon and noticed that defendant had a scratch on his nose and his palm was red. He told her he had slipped while climbing up some rocks, grabbed for a branch, and hit his hand on a rock. Fielding had not noticed any injuries on defendant the previous night.

Fred Curiel initially told the police that he had seen defendant just before 9:30 a.m. on the morning of October 15, and that he saw no bleeding wound on his face or other injuries to his body. He also told police that he and his family left the house to go shopping about 10:20 a.m. At trial, Fred testified that he did not have a clear recollection of seeing defendant that morning and whether there was blood on his face. He also stated that he revised his time estimates after learning from the defense investigator that the prosecutor had made representations about a different time line during his opening statement to the jury. At trial, his best estimate was that he left the house at 10:20 a.m. to get in the car, and that the rest of his family got into the car six or seven minutes later and they all left together.

Sometime before 2:00 p.m., Kim Curiel's brother, Marcus Miller-Hogg called the house looking for defendant's mother. Defendant answered the telephone.

Miller-Hogg had known defendant since he was 10 years old.  During the conversation, defendant told Miller-Hogg that his hand and wrist were swollen and asked Miller-Hogg what he should do.  Defendant told him that he was walking behind the barn to look at a waterfall and fell in the ravine.

Jena picked defendant up at his house about 2:00 p.m. on the afternoon of the 15th, and they spent the afternoon together.  Defendant called Robin that evening and told him he wanted to come over and pick up some marijuana.  Robin had never furnished marijuana to defendant before.  Defendant and Jena arrived at Robin's house about 8:00 p.m. and defendant gave Robin $40 for the marijuana and in repayment of other debts.  That night, Jena noticed that defendant had scratches on his face, that his right wrist and hand were swollen, and that his arm was tender.  He told her he went for a walk in the morning and that a tree or bush scratched his face and his palm was swollen because he fell and slid during the walk.

Shortly after defendant arrived at Robin's house, defendant's mother called Jena's cell phone wanting to talk to defendant.  Jena told defendant and he called his mother back using Robin's phone.  Fielding told defendant that there was a rumor someone in the canyon had been killed, the police were denying access to the area, and he should not try to go home.  Defendant told Jena that if she took him home, he would "have to be questioned by the police" and it would be "too much of a hassle."  When defendant, Jena, and Robin were speculating about who may have been killed, defendant stated that it was most likely at Horowitz's house because of his stature as an attorney.  He also mentioned that he had seen someone on his walk that morning and wondered if it could have been the killer.  At one point, he recited a rhyme about Lizzie Borden and 40 whacks.  He offered that if you wanted to kill someone, the most painless way would be to shoot them but, if you wanted to cause pain, you would bludgeon the person 36 or 39 times.  [FN7]   After leaving Robin's house, defendant and Jena went to Jena's home where they watched a show and drank absinthe.

> FN7.  Jena testified that she could not remember whether defendant used the number 36 or 39 when he made this comment.

### 7. *Defendant Confronted With Credit Card Fraud*

Schneider reported what she had learned about the credit card fraud to the Lafayette police on the afternoon of October 14.  She was concerned that the fraudulent charges might be related to an incident that had occurred on October 1, in which she had struck defendant's family dog, Jazz, as she was driving down the canyon road to work.  [FN8]  Schneider thought the fraudulent charges for goods to be delivered to Fielding's residence might be a way to make her pay for Jazz's veterinarian bills.  The discovery of the credit card fraud frightened Schneider and caused her to ask a relative to stay with her on Friday night because her husband was working out of town.

> FN8.  Jazz was severely injured and eventually had to be put down.  Schneider had apologized for hitting Jazz, but Fielding was angry with her for not taking full responsibility.  Even though Jazz had been in defendant's family since defendant was two years old, defendant had shown no emotion about the dog's condition.  Kim Curiel described defendant's demeanor as being similar to his demeanor at his sister's funeral—withdrawn, serious, silent, and sullen.

On Saturday, Schneider drove to King City in the morning and spent the day with

her husband.  She and her husband had planned the visit a few weeks earlier.  At 11:30 p.m., Schneider's daughter called her in King City and told her about Vitale's murder.  Schneider came home from King City the next morning.  She arranged for a road association meeting to take place on Sunday afternoon, October 16, so that she could inform the neighbors about the credit card fraud.  In addition to Schneider and other residents of the canyon community, Kim and Fred Curiel and defendant's mother attended the meeting.  The neighbors discussed the murder and speculated about who killed Vitale.  Near the end of the meeting, Fielding expressed anger at Schneider for not taking responsibility for injuring the dog.  In response, Schneider told Fielding that "you guys are trying to kill me." Fielding said, "What are you talking about?  What do you mean?"  Schneider pulled out the credit card orders that Jahosky had faxed to her and pointed out that the orders used the Horowitz address and seem to have been placed by Fielding. Fielding and Fred Curiel looked over the orders in Schneider's presence and could not figure out how Fielding's name could be on them.  Schneider gave Fielding and Fred the papers to take with them.

Following the road association meeting, Fred—a computer consultant by trade— demanded to look at all of the computers in the house, including defendant's. Although the browser history on defendant's computer had been erased, certain files remained, showing that the computer had been used to access the Specialty Lighting Web site where the fraudulent orders had been placed.  After looking at defendant's computer, the Curiels and Fielding confronted defendant in the early morning hours of Monday, October 17, about the credit card fraud.  Defendant initially denied involvement and claimed that someone must have broken into the house and accessed his computer.  Still suspecting that defendant was involved in the fraud, Fielding confronted him again later and defendant repeated his denial of wrongdoing.  She expected that Fred would next want to search defendant's room. Because Fielding was afraid that she and defendant would be asked to leave the residence over the fraud, she told him he would have one chance to get rid of anything relating to the credit card fraud.  At trial, Fielding denied that she had made any connection between the credit card fraud and Vitale's murder when she suggested that defendant remove evidence from his room.

Defendant and Jena had spent Sunday at the Renaissance Faire in Gilroy.  After the fair, the couple went to defendant's residence where Jena took a nap in defendant's room.  When Jena awoke, defendant was looking through things in his room.  He told her that other residents were accusing him of credit card fraud. Defendant told Jena that his mother told him to pack his things because his room might be searched by police.  Defendant placed a number of items into a red-and-black backpack, including a pair of shoes without laces that he had worn to the fair, and five books.  [FN9]  Defendant gave Jena the backpack and some bags and asked her to keep them for him.

> FN9.  The titles of the books were Silence of the Lambs, Fathers of the Dead, Hannibal, Absinthe, and Black Sunday.

On Monday afternoon, Kim talked to defendant about Vitale and how sad she was about Vitale's death, to which he responded, "Well, these things will happen." Kim testified that she was angered by "the way he said it so callously."

### 8. *Defendant's Story About DNA Evidence*

Just before noon on Tuesday, October 18, the Curiels again raised the credit card fraud issue with defendant, and defendant again denied having placed the fraudulent orders.  Fred told defendant that it did not look as if anyone had broken

into his computer and asked him whether he understood that his use of Vitale's home telephone number and address could tie him to the murder. Defendant said he understood and began pacing nervously. At some point, Fred told defendant he had nothing to worry about. When defendant asked him what he meant, Fred responded that if Vitale struggled with her attacker as Horowitz had told the press, "then it's virtually guaranteed that there will be DNA . . . under her fingernails, there will be footprints and there probably will be hair." Defendant did not respond to that.

Kim then asked defendant where he was on Saturday morning and defendant replied that he went out for a walk. Kim asked him whether he had seen or talked to anyone on his walk. Defendant thought for a while and then said he remembered talking to someone on his way to the barn. He said there was a woman driving a white, four-door sedan. He said she had long straight brown hair and large glasses, and she had rolled down her window and stopped the car. He told Kim he spoke with the woman and that she reached across and grabbed his arm and said, "You've got to believe." Kim told defendant that the description sounded "a whole lot like Pamela Vitale," and asked defendant whether he knew her. Defendant said he did not. He continued, "Well, she grabbed me, she grabbed my arm, so she might have my DNA under her fingernails." Defendant showed the Curiels "fingernail marks" on his right arm and said, "She even left marks." At first, defendant said that the woman was driving out of the canyon when he encountered her. When Kim pointed out that if he was walking toward the barn the woman would have had to reach across the passenger seat to grab his arm if she was driving downhill out of the canyon, defendant changed his story and claimed he encountered her coming home when he was heading up the hill.

Recognizing that defendant's description of the woman sounded exactly like Vitale, Fred told defendant that Vitale was found in her panties and a T-shirt and could not have been out that morning. After a pause, defendant said, "What if my DNA is there?" This question "stunned" Fred and he did not respond. After Kim asked defendant a few more questions, defendant again asked about the possible presence of his DNA. Fred responded, "Don't worry. If you weren't there, then your DNA won't be there." Defendant said, "But what if it is there?" and Fred responded, "Well, that would mean you were there and that would mean you are going to do time." Defendant was "visibly nervous" and "physically shaking" during this discussion with the Curiels.

On Tuesday afternoon, Jena drove defendant to see Robin at Robin's high school. Defendant told Robin that he was going to admit the credit card fraud to Fred and would say that he used Robin's computer to do the research, in order to clear Robin's name. Defendant also told Robin that he was going to admit the fraud because he was afraid of being linked to the murder and believed admitting the fraud "would separate him from that." When Robin asked defendant about the connection between the fraud and the murder, he "didn't really get a coherent answer."

Defendant also told Robin that he was afraid of being linked to the murder by DNA evidence because the person he had seen on his walk Saturday morning (who he had originally told Robin and Jena on Saturday night might have been the killer) was in fact the woman who was murdered, and that she had grabbed his wrist. On the drive back to his house after seeing Robin, defendant told Jena that on his way home from his walk Saturday morning he encountered a man and woman in a car, and the woman reached over the man from the passenger seat, grabbed his arm, and left scratches. Defendant also spoke to his mother, and to

Michael Sikkema and Sikkema's wife that day about his encounter with the woman on his walk.  He told his mother that the woman said, "I can't believe this is happening," before grabbing him.  He told Sikkema that the story about the woman on the road was "a hallucination."  He told Sikkema's wife, "My DNA is on Pamela Vitale."

Later on Tuesday, defendant admitted to the Curiels that he was responsible for the credit card fraud and that he had lied to them about it.  Defendant started crying and said that he wanted to "admit this and get this fixed and go to school."

### 9. *Defendant's Arrest*

Fred Curiel called Robin's father, Thomas, on Tuesday afternoon and told him about the fraud.  With Thomas's consent, the Curiels drove to his house and confirmed that Robin had been involved in the fraud by examining his computer.  Fred also expressed his concern that there might be a connection between the fraud and Vitale's murder.  Thomas confronted Robin late that afternoon and made his son tell him everything he knew.  The C.s immediately retained counsel and contacted police on Wednesday.  Robin was granted immunity that day in exchange for his information.  Defendant was arrested on Wednesday evening.

### 10. *Defendant's Backpack*

On Thursday, October 20, Fielding went to her sister's house in Bolinas.  The next day, Jena and her mother drove defendant's backpack and other possessions to Fielding in Bolinas.  After Jena and her mother left, Fielding went through defendant's property.  She saw scraps of paper with credit card account numbers and names—including those of Schneider and Halpin—as well as a date book or journal, a box of gloves, two pairs of pants, three shirts, a pair of defendant's shoes, movies, an external hard drive, a book on mass murder and cult leaders, a knife, and empty bottles of absinthe.  Fielding threw the papers, gloves, and a journal or date book of defendant's into the fire of a wood-burning stove.  [FN10]

> FN10.   Fielding admitted that she initially testified at defendant's preliminary hearing to seeing Vitale's name, along with Schneider's and Halpin's, on the scraps of paper.  Upon being further questioned on that at the preliminary hearing, she stated, "On second thought, I think I was wrong about that."  At trial, Fielding denied having seen Vitale's name on any of the papers she burned.

The remaining items that were not burned were eventually turned over to police.  The backpack contained, among other items, a T-shirt containing possible blood evidence and a pair of Land's End slip-on shoes.  The general pattern of the Land's End shoe was the same as the general pattern of the shoe print found on the plastic storage bin lid found at the murder scene.  A criminalist for the Contra Costa County Sheriff's Department Crime Lab opined that defendant's shoes, or another shoe with the same pattern, made the print on the lid.  The shoes were identified as defendant's and were the same shoes defendant wore to the Renaissance Faire with Jena on the day after the murder.

### 11. *The Duffle Bag*

On October 20, sheriff's officers searched Fielding's abandoned Toyota van, which was on the property at 1050 Hunsaker Canyon Road.  The van had been there for several years and was surrounded by vegetation.  The interior of the van contained papers, files, and other debris, as well as dead rodents, animal feces,

and dead vegetation. Portions of the interior of the van tested presumptively positive for the presence of blood. Behind the driver's seat, officers found a duffle bag that "stood out" because it was "newer looking" and did not have the "weather-beaten look" of the other materials in the van.

The bag contained a lightweight, dark sweater or pullover, a blue balaclava or head mask, [FN11] and a black, costume-style evening glove that extended up the forearm. Each item was turned inside out and appeared to contain blood stains. The fabric pattern of the glove was similar to the fabric prints left at the scene of the murder. The duffle bag also contained an overcoat, identified as defendant's, with the left sleeve turned inside out and safety pins affixed to the right cuff and bottom. Defendant often wore safety pins in his clothing. The black pullover shirt found in the duffle bag was similar to shirts defendant owned. The glove was similar to gloves Fielding bought and kept in a costume box for the kids in the house to play with, and that defendant sometimes wore.

> FN 11. A balaclava is a knit cap that covers the head and neck. (Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 86.) The balaclava recovered from the duffle bag in this case was designed to cover the wearer's face except for the eyes.

The duffle bag had an airline tag from December 2003 with defendant's name on it. Various areas of the bag appeared to contain blood stains. The duffle bag was similar to luggage that defendant and the Curiels used when they flew to Hawaii in 2003. On the Monday after the murder, Fielding saw the duffle bag in the van and believed it was defendant's. She spoke to defendant about it and he said something about old clothes and words to the effect that he had left the bag there.

## 12. *Discovery of Bullet-point List and Other Papers*

In late November or early December 2005, Fred Curiel's brother, David, moved into defendant's room at 1050 Hunsaker Canyon Road. At the end of January 2006, as he was cleaning up the house in preparation for a party, David stuffed some of his gloves into a dresser drawer in his room. The drawer also contained a pad of scratch paper. The morning after the party, David opened the drawer looking for his pad of scratch paper. He noticed five loose pieces of paper with handwriting on them. The papers were similar in size to those on the scratch paper pad he had put into the drawer, and to other pads of recycled scratch paper of varying sizes that the Curiels kept at the house.

Four of the papers had account names, numbers, and access codes for multiple accounts—including credit card and brokerage accounts—as well as addresses, phone numbers, and birth dates. These papers contained John Halpin's name, birth date, credit card security code number, and user names and passwords for several of his online accounts, written in defendant's handwriting. Halpin testified that he was not aware of any way a person could get access to all of this information about him without sitting at his computer.

David turned the papers over to police. He told a sheriff's detective that the papers had been "wedged between the framework and the top of a dresser." Forensic analysis revealed that two of the five papers contained defendant's fingerprints.

A fifth piece of paper, in defendant's handwriting, had a vertical, unnumbered list of five bullet points, followed by text. The five bullet points read in order as follows: "Knockout/Kidnap," "question," "Keep captive to confirm PINS," "dirty

United States District Court
Northern District of California

work," and "dispose of evidense [*sic*]."  The words "cut up, bury" followed the last bullet point, enclosed in parentheses.

**13.** *DNA Evidence*

David Stockwell, senior criminalist at the Contra Costa County Sheriff's Department Crime Lab, conducted a DNA analysis of the evidence recovered from the duffle bag and backpack and determined that Vitale's blood was on the duffle bag, glove, mask, and shoes.

Analysis of DNA found on the glove established that if there were more than two contributors, defendant could not be excluded as one of the contributors.  However, if there were only two contributors, defendant could not have been one of them.  Stockwell opined that it would not be unexpected to find multiple contributors if the glove was kept in a box containing various articles of dress-up clothing that were sometimes handled or worn by others, including children.  The inside of the glove contained not more than two DNA contributors and defendant was excluded.

Six areas of the mask were analyzed, with four of the sites matching Vitale.  The area of the mask corresponding to the wearer's mouth contained no blood, but did contain a single source of DNA matching defendant's.  The statistical probability of finding an individual with the same DNA profile as that on the mouth portion of the mask was one in 1.8 quadrillion African-Americans, one in 780 trillion Caucasians, and one in 1.6 quadrillion Hispanics.  An area above the left eye opening contained a mixture of DNA consistent with Vitale's and defendant's.  However, the sample collected from that site was degraded and a larger number of persons—one in 150 African-Americans, one in 59 Caucasians, and one in 79 Hispanics—have DNA profiles that would include them as potential contributors to the mixture.

DNA found on the duffle bag contained a major component matching Vitale's DNA profile and a minor component that could only be profiled at seven loci.  The minor component's profile was consistent with defendant's.  That profile would be found in one of 4,500 African Americans, one in 560 Caucasians, and one in 650 Hispanics.

The shirt found in the duffle bag contained DNA matching defendant's.  The shoes contained two areas of blood evidence allowing for a full DNA profile for a single contributor, both of which matched Vitale's DNA.  A degraded area on the sole of the shoe showed three separate contributors, including Vitale and defendant.  The presence of DNA from a third donor on the sole of the shoe could be explained, for example, if the wearer had been walking around at a fair.

Stockwell analyzed a swab taken from the bottom of Vitale's right foot, which revealed a mix of contributors, with the primary contributor being Vitale and the minor contributor being male.  As to the male component, Stockwell identified a partial profile that matched defendant.  As to that partial profile, Stockwell calculated that one in 81,000 African-Americans, one in 43,000 Caucasians, and one in 23,000 Hispanics would have the same profile.

To verify that the male component of the sample came from a single male donor, Stockwell sent the sample to Gary Harmor at Serological Research Institute for Y-STR profiling.  [FN12]  Harmor used a test kit that displays 17 different markers on the Y chromosome.  He found that the male component of the sample was indistinguishable from defendant's DNA for all 17 markers.  In the case of Y-

13

STR's, the statistical significance of such a match can only be determined by comparing the profile found to a database. The company that makes the test kit, Applied Biosystems, Inc., has an online database consisting of the Y-STR profiles of 3,561 different people chosen at random. Harmor determined that the database did not contain any profile matching the Y-STR profile shared by the evidence sample and defendant's Y-chromosome DNA. Due to the relatively small size of the database and the nature of the Y chromosome, however, it is not possible to directly extrapolate from the absence of a match the frequency with which that profile may occur in the general population. However, Stockwell performed a further statistical analysis to derive a conservative estimate that no more than one person in 1,189 would share the same Y-STR profile as defendant's.

> FN12. STR stands for "Short Tandem Repeats." (Nat. Research Council, The Evaluation of Forensic DNA Evidence (1996) p. 23.) STR's are a particular type of loci where the same DNA sequence is repeated a variable number of times depending on the person's genotype. (Id. at p. 70.) Y-STR profiling focuses on DNA loci found only on the Y chromosome, which exists only in males.

DNA testing of Vitale's fingernails found no DNA present other than her own.

**B. *Defense Case***

Joanna Tams, a geology teacher at Acalanes High School, coached the Ultimate Frisbee team. As a team member, defendant was dedicated, caring toward others, and well loved by everyone on the team. He was extremely responsible and worked hard to improve his performance. Tams made him one of the team captains. She considered him a "peaceful" person, very calm and respectful of his teammates and opponents. He was happy and outgoing.

Susan Lane teaches graphic design at Acalanes High School. Lane was defendant's teacher in the 2004-2005 school year. He attended regularly and was always on time. He was quiet and focused. Defendant was respectful, polite, and engaged in his relationships with other students. She frequently posted his artwork in her classroom because she regarded it as "exceptional art." Shown examples of defendant's artwork in class, Lane considered it to be very much mainstream relative to the student work she had seen over the 10 years she had taught at Acalanes. She did not find the drawings of dismembered body parts and blood dripping from a person holding a severed head exceptionally different from other student artwork. Probably 20 percent of her students produce artwork with violent or gruesome aspects. Defendant had also done artwork for her that is beautiful and bright. Lane did not consider defendant a violent person.

Rebecca Gray, a junior at Acalanes High School, was a friend of defendant's. She testified that she had never seen defendant frustrated or angry, that he always had a smile, was kind, and acted like an older brother to a lot of her friends. She had never seen him act in a violent manner. Rebecca's mother found defendant to be an "impressive young man." He was always polite and kind. She never saw him get violent or lose his temper or lose control.

Kameryn Summers testified that she had just graduated from Acalanes High School and was attending Diablo Valley College. She was a teammate of defendant's on the Frisbee team. She testified that defendant was a "really caring guy, . . . really fun," who was always available to his friends when they needed someone to talk to. He was one of the calmest people she knew. He was respectful to her parents and interacted well with them. She had never seen him

14

be violent in any way, shape, or form.

Deputy sheriff criminalist Eric Collins processed defendant on October 20, and estimated that he was approximately five feet six inches tall and weighed 110 pounds.

**C.** *Verdict, Sentencing, and Appeal*

On August 28, 2006, a jury found defendant guilty of first degree murder and residential burglary, and found true the weapon use and burglary special-circumstance allegations.  The trial court sentenced defendant to life in prison without the possibility of parole for the murder violation and an additional year for the weapon use.  As to the residential burglary conviction, the court imposed the mid-term of four years and stayed execution of that term.

*People v. Dyleski*, No. A115725, 2009 WL 1114077, at *1-14 (Cal. Ct. App. April 27, 2009).


**II.     Procedural History**

Petitioner appealed and the California Court of Appeal affirmed petitioner's conviction in a reasoned opinion.  Dkt. No. 17-2, Exhs. 6, 9.[1]  On August 12, 2009, the California Supreme Court summarily denied petitioner's request for review.  Dkt. No. 17-2, Exhs. 10, 11.  The U.S. Supreme Court denied certiorari on May 24, 2010.  *Dyleski v. California*, 560 U.S. 927 (2010).

On May 23, 2011, petitioner filed a petition for writ of habeas corpus in the Contra Costa County Superior Court, and the petition was denied without prejudice on June 16, 2011.  Dkt. No. 17-2, Exhs. 12, 13.  Petitioner filed an amended petition in the superior court on August 12, 2011.  Dkt. No. 17-2, Exh. 14.  The trial court denied this petition in a 34-page opinion on October 10, 2011.  Dkt. No. 17-2, Exh. 15.

Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal on December 28, 2011, and it was denied on July 2, 2012.  Dkt. No. 17-2, Exhs. 16, 19.  He filed a petition in the California Supreme Court on October 2, 2012.  Dkt. No. 17-2, Exh. 20.  On October 16, 2012, he filed the present petition in this Court and moved for a stay pending the California Supreme Court's decision.  Dkt. Nos. 1, 4.

On March 13, 2013, the California Supreme Court denied the petition without prejudice to petitioner filing an original petition in the superior court for any relief to which he might be

---

[1] The lodged exhibits associated with this docket entry are not available on ECF, but the Court refers to their number for ease of reference.

entitled following the outcome of *People v. Gutierrez*, 324 P.3d 245 (Cal. 2014). Dkt. No. 17-2, Exh. 21. (The opinion in *Gutierrez* ultimately issued on May 4, 2014.)  Petitioner represented that a final decision had been reached on his unexhausted claims and moved to lift the stay on April 10, 2013.  Dkt. No. 7.  Respondents did not oppose this motion.  The Court granted the motion and issued an order to show cause on August 7, 2013, finding that the following claims, liberally construed, warranted a response:

> (1) trial counsel's failure to investigate the facts of the case and present meritorious defenses deprived him of his right to due process and effective assistance of counsel; (2) the prosecutor's improper actions rendered his trial fundamentally unfair, thereby depriving him of due process; (3) appellate counsel's failure to sufficiently review the record and present available, meritorious defenses deprived him of his right to due process and effective assistance of counsel; (4) the combination of the first three claims resulted in a miscarriage of justice in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution; and (5) California Penal Code § 190.5 is unconstitutionally vague, favors life without parole sentences over more lenient sentences, and fails to provide sentencing discretion in violation of petitioner's Fifth, Sixth, and Eighth Amendment rights.

Dkt. No. 8.

On October 15, 2013, petitioner filed a motion for summary judgment, which he amended on October 16, 2013. Dkt. Nos. 10, 12.  The Court denied petitioner's summary judgment motion on November 13, 2013.  Dkt. No. 15.  Respondents filed an answer on December 19, 2013, stating that petitioner had exhausted his state remedies for the claims in his petition. Dkt. No. 17 at 2. Petitioner timely filed a traverse.  Dkt. No. 19.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief pursuant to 28 U.S.C. § 2254.  28 U.S.C. § 1331.  Venue is proper because the challenged conviction occurred within this judicial district in Contra Costa County, California.  28 U.S.C. §§ 84(a), 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally either the fact or length of their confinement in federal habeas proceedings are required first to exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  "An applicant

United States District Court
Northern District of California

shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(b)(3).

Prisoners may advance such challenges either on direct appeal or through collateral proceedings by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b)-(c).

Petitioner has exhausted claims one through four, set out above. For reasons explained in Part V of this order, petitioner has not presently exhausted claim five, his claim challenging the constitutionality of California Penal Code § 190.5. He must first pursue his state law remedy for resentencing pursuant to the United States Supreme Court's decision in *Miller v. Alabama*, 132 S.Ct. 2455 (2012), the California Supreme Court's decision in *People v. Gutierrez*, 58 Cal. 4th 1354 (Cal. 2014), the United States Supreme Court's decision in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the California Court of Appeal's decision in *People v. Berg*, 2016 WL 2854322 (Cal. Ct. App. May 12, 2016), and the forthcoming California Supreme Court decision in *In re Kirchner*, 244 Cal. App. 4th 1398 (Cal. App. 2016), *review granted*, 2016 WL 2908028 (Cal. May 18, 2016).

## STANDARDS OF REVIEW

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams (Terry) v. Taylor*, 529 U.S. 362, 413 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams (Terry) v. Taylor*, 529 U.S. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

"When a federal claim has been presented to a state court and the state court has denied

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).   A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).

**DISCUSSION**

**I.      Ineffective Assistance of Trial Counsel Claims**

Petitioner alleges that he received ineffective assistance of trial counsel because counsel failed to:  (1) develop exculpatory inconsistencies in the prosecution's theory of the case; (2) failed to present evidence implicating a third party in the crime; (3) failed to present evidence of crime scene contamination; (4) failed to seek exclusion of prejudicial evidence; (5) failed to challenge expert testimony; and (6) failed to challenge the charging information through a § 995 motion.  *See* Dkt. No. 1-1 at 45, 47, 181.

Different iterations of petitioner's ineffective assistance of trial counsel claims were presented on habeas to the Contra Costa County Superior Court and the California Court of Appeal.  Petitioner's ineffective assistance of trial counsel claim was presented in its current form to the California Supreme Court.  The California Supreme Court summarily denied this claim. Dkt. No. 17-2 at 21.  The parties agree that petitioner has exhausted this claim.  Dkt. No. 17 at 2; Dkt. No. 7.

**A.      Applicable Law**

The Sixth Amendment guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  *Id.*  The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction.  *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

United States District Court
Northern District of California

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, petitioner must satisfy a two-prong test. First, he must establish that counsel's performance was deficient. A deficient performance is one that falls below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance; he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* A court deciding an ineffective assistance of counsel claim may consider the prongs of the test in either order: "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Williams*, 529 U.S. at 404-08. The general rule of *Strickland*, to review a defense counsel's effectiveness with great deference, gives state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Pinholster*, 563 U.S. at 201; *Richter*, 562 U.S. at 105; *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). When § 2254(d) applies, the question "is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Petitioner has not shown that his trial counsel was ineffective.

**B.     Analysis**

      **1.     Failure to Develop Inconsistencies and to Present Evidence Implicating a Third Party**

Petitioner contends that trial counsel failed to investigate or present several pieces of evidence that would have cast doubt on the prosecution's case. Dkt. No. 1-1 at 182. His theory is that the evidence implicates Ms. Vitale's husband, Daniel Horowitz, in her murder, and that petitioner would not have been found guilty if trial counsel had presented this evidence more effectively. Dkt. No. 1-1 at 182-95. In particular, petitioner claims that crime scene evidence points to a killer who was comfortable in the home, not in a hurry, and motivated by anger, and that Mr. Horowitz fits this description better than petitioner. Dkt. No. 1-1 at 196.

Petitioner argues that a folded pair of bloody eyeglasses found at the crime scene and bloody handprints on boxes, papers, and objects in the sink demonstrate that the perpetrator attempted to "straighten up" the home after killing Ms. Vitale. Dkt. No. 1-1 at 183. Dishes, including a bloody bowl and a broken coffee mug with Mr. Horowitz's DNA on it, were found near the kitchen sink, but there were no blood stains on the faucet. Dkt. No. 1-1 at 196. There were also bloodstains on the shower wall, curtain, and hot water knob, and the shower may have been run. Dkt. No. 1-1 at 182-185. According to petitioner, this indicates that the killer proceeded directly to the shower to clean up, and perhaps to take a shower, without first trying to use the sink. Dkt. No. 1-1 at 185. The killer did so, petitioner argues, with the knowledge that the hot water spigot on the sink was broken, a fact that only someone familiar with the house would know. *Id.* Petitioner also argues that crime scene photographs show that someone with bloody hands was able to leave the home and reenter by using a key. Dkt. No. 1-1 at 184.

Petitioner also contends that trial counsel should have hired a crime scene expert to investigate further and to rebut the prosecution's analysis of the evidence. Dkt. No. 1-1 at 191. He bases this argument largely on the unsworn report of crime scene analyst Brent Turvey, who was engaged by petitioner's family post-conviction. *See id.*; Dkt. No. 2-18, Ex. F ("Turvey Report"). The Turvey Report concludes that some items in the home were not properly examined, that the available evidence was more consistent with an anger motive than a profit motive, that the perpetrator exhibited care and familiarity in the home, and that the DNA evidence implicating

United States District Court
Northern District of California

petitioner should have been independently analyzed.  Dkt. No. 2-18 at 369-70.  Petitioner also refers to the opinion of Dr. Laufer, who was retained by petitioner's habeas attorneys for the purpose of evaluating the trial testimony of the individual who conducted the autopsy of Ms. Vitale.  *See* Dkt. No. 2-19, Ex. G ("Laufer Decl.").  Dr. Laufer admits that he was not provided with x-rays taken in the course of the autopsy, nor was he given the opportunity to examine any histological (tissue) slides.  *Id.*  Laufer concludes that Ms. Vitale's injuries were atypical of a burglary gone bad and instead suggested a protracted struggle with no attempt to flee.  *Id.*  Dr. Laufer also claims in his declaration that the cuts on Ms. Vitale's back were more likely caused by a key than a knife.  *Id.*

Petitioner further argues that trial counsel was ineffective for failing to challenge the prosecution's timeline evidence.  Dkt. No. 1-1 at 187.  He claims that the items placed in the sink, the bloody prints on boxes in the home, the fact that the shower had been run, and the alleged reentry with a key are all inconsistent with a perpetrator who was pressed for time.  Dkt. No. 1-1 at 188-89.  He also notes that Mr. and Ms. Curiel initially stated to police that petitioner had returned home at 9:26 or 9:30 a.m., while the evidence showed Ms. Vitale was alive and using her laptop computer until 10:12 a.m.  Dkt. No. 1-1 at 189.  He further claims that the prosecution's timeline, which has petitioner returning home at 10:45 a.m., is implausible because it provides only 33 minutes to commit the murder, straighten up items in the house, dispose of bloody clothing, and walk back home.  Dkt. No. 1-1 at 190.

Finally, petitioner asserts that trial counsel was ineffective for failing to argue that, in addition to the perpetrator's alleged comfort and familiarity with the home, Mr. Horowitz's history of anger, his inconsistent statements about details of the crime scene, and his lack of apparent grief implicated him in his wife's murder.  Dkt. No. 1-1 at 196-209.  Petitioner cites interviews with several individuals who report angry outbursts by Mr. Horowitz, arguments with Ms. Vitale and financial difficulties involving construction of their house, speculation that Mr. Horowitz was having an affair, and suspicion that a black eye Ms. Vitale suffered was the result of domestic abuse.  Dkt. No. 1-1 at 198- 205.  Petitioner also contends that Mr. Horowitz knew about a check owed to Joe Lynch for a delivery of water, but highlights Mr. Lynch being "adamant" that he had

United States District Court
Northern District of California

only left a message requesting the check the afternoon of the murder.  Dkt. No. 1-1 at 209.  This knowledge, along with a statement Mr. Horowitz made about the possibility of other wounds on Ms. Vitale's body, allegedly demonstrate that Mr. Horowitz was aware of details he could only have known if he were in the home the day of the murder.  In addition, petitioner argues that Mr. Horowitz's behavior after his wife's murder was inconsistent with a grieving husband's: he made phone calls and spoke matter-of-factly after the murder, he speculated about the possible identity of the killer, and after screaming on the call to 911 his voice later became calm.  Dkt. No. 1-1 at 206-208.  Furthermore, petitioner alleges that Susan Polk, a client of Horowitz, said that Horowitz admitted to her that he framed petitioner.  Dkt. No. 1-1 at 213, n.16 (citing Dkt. No. 2-20, 21, Exh. J. ("Polk Declaration")).

The Contra Costa County Superior Court addressed most of these arguments in detail and explained why they were insufficient to establish that the performance of petitioner's trial counsel was deficient.  *See* Dkt. No. 17-2, Ex. 15 ("Habeas Order") at 16-25.

As the superior court reasonably found, petitioner's arguments rely on conclusions in the Turvey Report and Laufer Declaration that are speculative and fail to account for contradictory evidence.  The presence of a bloody bowl and a broken mug in and near the sink do not necessarily imply the killer was "comfortable" in the home or that the killer knew about the broken faucet.  *Id.* at 17.  The fact that Mr. Horowitz's DNA was present on a mug in his own home is also unsurprising.  If the killer had taken the time to shower, as the Turvey Report suggests, the blood stains on the shower wall and curtain would have been diluted or washed away, which they were not.  *Id.* at 18.  The folded glasses found at the crime scene do not suggest familiarity; neither Mr. Horowitz nor Ms. Vitale's sister recognized the glasses, and there is no basis for the report's speculation that the perpetrator comfortably removed or had Ms. Vitale remove the glasses on the morning of the murder.  *Id.* at 17-18.  The Turvey Report ignores evidence of injuries to petitioner, including the testimony of multiple witnesses who saw his swollen right hand and the fresh gouge marks on his nose and cheek that were still bleeding shortly after the time of Ms. Vitale's murder.  *Id.* at 19-20.  Although the report asserts that DNA evidence against petitioner was "problematic at best," the evidence produced at trial was

substantial.  *Id.* at 20-21.  The report also concludes that the killing was motivated by anger, but the superior court found that this conclusion ignores compelling evidence that petitioner entered the home intending to steal Ms. Vitale's credit card information:

> First, there is no dispute that defendant and Robin C. entered into a scheme to commit credit card fraud to purchase marijuana growing equipment.  Second, in furtherance of the scheme, defendant had obtained and attempted to use the numbers and security codes for credit cards belonging to two of his neighbors.  Third, Vitale's address and unlisted telephone number appeared on three of the four orders defendant placed with Specialty Lighting on October 13, 2005.  Fourth, defendant learned the day before the murder that Specialty Lighting would not put the orders through and ship the items.  Fifth, after learning this, defendant unsuccessfully attempted to have the merchandise shipped to Vitale's address using Schneider's credit card information, only to be told that the credit card company had refused the charges.  Sixth, within 24 hours before the murder, defendant left a message for Robin advising him that the transactions had not gone through but "he was going to find a way to make it work."  Seventh, it is reasonable to infer that defendant intended to obtain Vitale's credit card information since he had been led to believe by Jahosky that Schneider's and Halpin's credit card companies had refused the charges.  Finally, the bullet-point list found in defendant's drawer by David Curiel shows that defendant had drawn up a plan to obtain account information and PIN's from someone by knocking them out, holding them captive, and killing them after the information was confirmed.

*Id.* (quoting *Dyleski*, 2009 WL 1114077, at *24).  The report's conclusion that the killer left and reentered the house using a key is also speculative and unfounded.  The Turvey Report focuses on the presence of blood near the deadbolt lock on the house door, but it fails to mention the bloody streaks resembling finger trails on the lower portion of the door that are apparent in the crime scene photographs.  *See* Dkt. No. 2, Ex. 19.  These photographs do not demonstrate that someone entered the house with a key.  Indeed, they are more consistent with the conclusion that Ms. Vitale briefly managed to open the door during the attack but was unable to escape.

With respect to Dr. Laufer's opinion, the superior court also found that his conclusions lacked foundation and were not logically connected to the facts in the case.  Habeas Order at 16.  There was no evidentiary support for the claim that Ms. Vitale did not attempt to flee; the evidence that most of the struggle took place in the entryway and that there were bloody marks on the exterior of the door suggest that she did try to get out.  *Id.* at 17.  Likewise, there was no basis for the opinion that the wounds on Ms. Vitale's back were caused by a key.  The doctor who performed Ms. Vitale's autopsy observed three intersecting incisions on her back, each approximately four inches in length, in the shape of an "H."  *Dyleski*, 2009 WL 1114077, at *2.

United States District Court
Northern District of California

1  Especially in light of the deep stab wound in Ms. Vitale's abdomen, trial counsel was not under an

2  obligation to elicit expert testimony hypothesizing that the wounds were caused by a key rather

3  than a knife.

4       Petitioner's contention that trial counsel should have challenged the prosecution's timeline

5  is similarly unpersuasive.  First, as petitioner concedes, trial counsel did attempt to present an alibi

6  defense by arguing that petitioner returned home at 9:26 a.m.  Dkt. No. 1-1 at 190.  This argument

7  was simply unsuccessful.  Although the Curiels initially reported to police that petitioner had

8  returned home at approximately 9:30 a.m., both changed their testimony at trial: Ms. Curiel

9  testified that she saw petitioner enter at approximately 10:45 a.m., and Mr. Curiel admitted that he

10  did not have a clear recollection of what time petitioner came back home.  *See* Dkt. No. 17-2, Exh.

11  4 ("Reporter's Transcript") (10 RT 2866); (11 RT 3005.)  Ms. Curiel's revised estimate was based

12  on a sales receipt and the travel time from a store where the family went shopping that day.

13  *Dyleski*, 2009 WL 1114077, at *6.  Furthermore, the evidence does not support petitioner's claim

14  that the 33 minutes from 10:12 to 10:45 a.m. would have been insufficient to commit the murder

15  and return home.  As discussed above, there is no reasonable basis for the conclusion that the

16  perpetrator took extra time to exit and reenter the home using a key or to run the shower more than

17  briefly.  Furthermore, a sheriff's detective confirmed that it takes approximately 10 minutes to

18  walk from the Vitale-Horowitz residence to the property at 1050 Hunsaker Canyon Road where

19  petitioner lived and where his duffle bag was found in an abandoned van.[2]  *Dyleski*, 2009 WL

20  1114077, at *6.  This left petitioner without a credible alibi and with sufficient time to have

21  committed the murder.  Trial counsel therefore had no reasonable basis to make additional

22  challenges to the prosecution's timeline.

23       As the superior court explained, there are several problems with petitioner's argument that

24  trial counsel should have done more to implicate Mr. Horowitz in his wife's murder.  The

25  interviews petitioner cites to support his claims that Mr. Horowitz was angry and abusive are not

26

27       [2] The only evidence petitioner offers to contradict this estimate is a declaration by his
   mother, Esther Fielding, that the walk would take 25-30 minutes.  Even if counsel had elicited this
28  testimony at trial, however, Ms. Fielding was not particularly credible given that she was
   petitioner's mother and had previously destroyed evidence.

United States District Court
Northern District of California

compelling.  When detectives asked Ms. Vitale's sister, Tamara Hill, if Mr. Horowitz was ever abusive, her reply was equivocal:  she was unsure if Mr. Horowitz had ever hit his wife or if he had merely pushed her arm aside as he walked by.  Habeas Order at 22.  Ms. Hill also suggested that Mr. Horowitz did not act like a grieving husband after his wife's death, but there is no credible evidence to support this claim.  *Id.*  As the court noted, Ms. Hill's interview also reflects personal hostility toward Mr. Horowitz that undermines her credibility, as she repeatedly disparages him and remarks that his religion caused conflict within the family.  *Id.*

The other interviews contain allegations that are similarly vague, unsupported, and unconvincing.  The implication that Mr. Horowitz once gave Ms. Vitale a black eye, based on an interview with the couple's housekeeper, Araceli Solic, ignores Ms. Vitale's own explanation to Ms. Solic and Ms. Hill that she received it in an accident.  *Id.* at 23-24.  The unverified declaration of Mr. Horowitz's client, Susan Polk, about Horowitz's "admission" to framing petitioner, should be viewed in context—Polk indicated that she was also being framed for murder.[3]  *Id.* at 11, *see* Dkt. 2, Ex. J at 435.  Furthermore, petitioner's ineffective assistance argument ignores the fact that trial counsel successfully prevented the prosecution from playing the recording of Mr. Horowitz's 911 call, which was "gut-wrenching" and "extremely strong evidence of Mr. Horowitz's true and complete innocence."  Habeas Order at 24-25.  If trial counsel had tried to accuse Mr. Horowitz, it probably would have led to the introduction of the 911 recording as evidence, which would have further undermined petitioner's defense.

Moreover, even if petitioner's counsel had made the arguments outlined above, it would not have changed the outcome of the trial given the substantial evidence of petitioner's guilt.  In denying petitioner's state habeas petition, the superior court quoted the Court of Appeal to emphasize the magnitude of the evidence that pointed to petitioner as the killer:

> Vitale was struck numerous times with an irregular blunt object such as a rock, and then stabbed in the abdomen as she lay dying.  Based on examination of her

---

[3]  Polk was later convicted of murder prior to the petitioner's jury trial which would have undermined her credibility.  *See Polk v. Hughes*, No. 12-cv-05986, WL 2015 1322304, at *1 (N.D. Cal. Mar. 24, 2015).  Trial counsel's strategic decision not to present the testimony of a convicted murderer who was a dissatisfied former client of Mr. Horowitz does not amount to deficient performance.

computer, it appears that Vitale was killed shortly after 10:12 a.m. on October 15. Defendant, who lived a short distance from the murder scene, went out on the morning of the murder and returned home at 10:45 a.m.  No witness could account for his whereabouts during that time frame.  When defendant returned to his home, he had scratches and gouge marks on his nose and face that were actively bleeding, his hands were shaking, and his right hand and wrist were red and swollen.  Defendant's injuries are consistent with those that would be incurred by a person in the course of inflicting the injuries Vitale sustained. Defendant gave conflicting and implausible accounts of how he sustained his injuries.  He told his mother he had slipped and hit his hand on a rock while climbing up rocks, and told other people that he had been scratched by a bush or fell into a ravine while looking for a waterfall that he would have known was dry in October.  After his mother told him that evening that the police were in the neighborhood and there was a rumor someone in the canyon had been killed, defendant told his friends that it most likely was at Horowitz's house and he joked about bludgeoning someone 39 times as a way of killing them.

Two days before the murder, defendant had used Vitale's address and unlisted telephone number in ordering marijuana growing supplies using credit card information stolen from two neighbors.  Those orders did not go through and defendant was told that the credit card companies had declined the orders because the billing and shipping addresses did not match.  The day before the murder, he told his friend, Robin, that he was going to find a way to make it work.  At some point, defendant wrote out a to-do list or plan that included knocking someone out, holding them captive to obtain their credit card information, and then killing them.  There was evidence of a fascination with violence and killing in defendant's artwork and writings.

Defendant had access to the means used to bludgeon and stab Vitale.  Rocks were readily available to defendant in the area around his home.  He owned a knife, and information on his computer showed he had purchased a knife a few months before the murder.  Defendant's mother had removed and hidden a knife that had been in the backpack he gave to Jena.  Defendant's own statements a few days after the murder are strong evidence of a consciousness of guilt.  When an unsuspecting Fred Curiel suggested to defendant that he need not worry about the police connecting the murder to the credit card fraud because the killer's DNA would almost certainly be found under the victim's fingernails, defendant became visibly nervous and told the Curiels a strange story about being scratched on the morning of the killing, for no apparent reason, by a woman matching Vitale's description who was driving a white, four-door sedan.  Defendant denied knowing Vitale, but he would have seen her that morning and would have noticed her white sedan parked outside her house, if he was the killer.  Defendant continued to insist that his DNA might be present at the murder scene even after Fred Curiel tried to assure him that it would not be.  Defendant offered two inconsistent versions of his encounter with the woman to the Curiels, and later told different versions of the story to others.  Given the inherent implausibility of defendant's story, the conflicting versions of it offered, and the circumstances in which it first emerged, the only reasonable inferences to be drawn are that (1) he was able to accurately describe Vitale's appearance because he had killed her a few days earlier; and (2) being conscious of his own guilt and convinced based on the protracted physical contact he had with Vitale during their struggle that his DNA would be found on her, he felt compelled to make up a cover story in advance to explain that fact.

Extensive physical evidence also linked defendant to the murder.  A duffle bag with his name tag was found adjacent to his house in his mother's abandoned van,

27

and contained a mask, glove, pullover, and overcoat. Forensic analysis established that Vitale's blood was on the bag, glove, and mask. DNA matching defendant's was found on the mouth area of the mask. Evidence was adduced that the murderer wore gloves and the glove found in the duffle bag was consistent with fabric prints left at the murder scene. The backpack defendant gave to Jena Reddy before his arrest contained a pair of his shoes, among other items. Vitale's blood was found on the shoe. The general pattern of the shoe matched the pattern of a shoe print found at the murder scene.

*Id.* at 25-28 (quoting *Dyleski*, 2009 WL 1114077, at *29-30).

In light of the substantial evidence presented at trial, it was reasonable for the superior court on habeas to conclude that petitioner failed to show a reasonable probability that, but for trial counsel's asserted errors, a more favorable outcome would have resulted. The California Supreme Court's summary denial on the merits adopting or substantially incorporating the reasoning from this previous state court decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### 2.      Failure to Present Evidence of Crime Scene Contamination

Petitioner also argues that trial counsel should have presented evidence that contamination of the crime scene undermined the integrity of the investigation. Dkt. No. 1-1 at 214-15. He identifies several concerns: crime scene photographs show that a ruler with blood on it was moved, items in the duffle bag may have been improperly handled when it was discovered, and forensic chain of custody tags were not signed for individual items within the duffle bag. *Id.*

Petitioner presented this argument to the California Court of Appeals as well as the California Supreme Court. Dkt. No. 17-2, Exhs. 16, 20. This Court presumes that the California Supreme Court, as the court producing the last state court decision, adjudicated the claim on the merits. *Richter*, 562 U.S. at 99.

The California Supreme Court's decision on the merits was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner's allegations of crime scene contamination are unsubstantiated and insufficient to show that prejudice resulted from any failure by trial counsel to raise the issue. The crime scene photographs show that a ruler used in the investigation may have had a small amount of blood on it, Dkt. No. 2, Ex. A, but

petitioner does not explain how this could have made all evidence from the crime scene unreliable. In particular, contamination from a ruler would do nothing to undermine the compelling DNA evidence, the presence of Ms. Vitale's blood on multiple items of petitioner's clothing, and his own injuries, that all amount to substantial evidence of petitioner's guilt. Likewise, trial counsel's failure to raise the alleged errors in handling the duffle bag fails on the prejudice prong of the *Strickland* analysis. The investigator who found the duffle bag manipulated items inside while wearing gloves, and he signed a chain of custody tag for the bag itself. (9 RT 2320-2339.) Petitioner's argument that Ms. Vitale's blood could have ended up in the duffle bag as a result of the use of the investigator's gloves is speculation.

### 3.    Failure to Seek Exclusion of Evidence

Petitioner argues that certain irrelevant and highly prejudicial evidence should have been excluded at trial, including violent artwork and writings by petitioner and a bumper sticker reading "I'm for the separation of church and hate." Dkt. No. 1-1 at 218-220. The writings contained themes of isolation and loneliness, and the artwork depicted knives, razor blades, blood, a swastika, references to serial killers, and a variety of symbols. *Id.* Petitioner claims that this evidence was irrelevant to the case and that it was prejudicial because it contained violent, hateful, and anti-Christian themes. *Id.*

Petitioner presented this argument to the California Court of Appeals as well as the California Supreme Court. Dkt. No. 17-2, Exhs. 16, 20. This Court presumes that the California Supreme Court, as the court producing the last state court decision, adjudicated the claim on the merits. *Richter*, 562 U.S. at 99.

The California Supreme Court's decision on the merits was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. As the government observes, trial counsel did object to the introduction of this evidence at the preliminary hearing, and the objection was overruled. Dkt. No. 17-2, Exh. 1 ("Clerk's Transcript") (2 CT 673-78). Because trial counsel made reasonable efforts to have the evidence excluded, petitioner has not shown deficient performance in not making the same objection again at trial. He has also failed to

United States District Court
Northern District of California

1    show that prejudice resulted, since there is no reasonable probability that excluding this evidence

2    would have changed the outcome at trial.

3         Even if petitioner's argument is construed to be a claim that the admission of the evidence

4    violated his constitutional rights, he has not shown that he is entitled to habeas relief.   An

5    evidentiary ruling by a state court is not subject to federal habeas review unless the ruling

6    "violates federal law, either by infringing upon a specific federal constitutional or statutory

7    provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process."

8    *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).   No Supreme Court ruling clearly

9    establishes that the admission of prejudicial or irrelevant evidence is a violation of due process

10   sufficient for habeas relief under AEDPA.   *See Holley v. Yarborough*, 568 F.3d 1091, 1101 & n.2

11   (9th Cir. 2009) (finding that the state court's admission of irrelevant evidence did not violate

12   clearly established federal law under § 2254(d) even though it would have made the trial

13   "fundamentally unfair" under Ninth Circuit precedent).   Petitioner cites one pre-AEDPA case,[4]

14   *McKinney v. Rees*, in support of his argument, but the court in that case affirmed a writ of habeas

15   corpus only where no reasonable inferences could be drawn from the disputed evidence and the

16   trial "was so infused with irrelevant prejudicial evidence as to be fundamentally unfair."   *See*

17   *McKinney v. Rees*, 993 F.2d 1378, 1385-86 (9th Cir. 1993).

18        Here, while reasonable minds could differ on whether the artwork or the bumper sticker

19   were more prejudicial than probative, the trial court's ruling admitting this evidence was not a

20   clear violation of petitioner's due process rights as construed by the United States Supreme Court.

21

22

23

24   ─────────────────────
     [4] Petitioner also points to "two recent highly publicized exonerations" where the defendants were
25   teenagers at the time of the crime and "the prosecution used drawings and writings of the accused
     as proof of guilt . . . .   [I]n both cases, the individuals were exonerated after spending over ten
26   years in prison."   Dkt. 1-1 at 220 (citing to *Echols v. State*, 373 S.W.3d 892 (Ark. 2010) and
     *Masters v. Gilmore*, 663 F. Supp. 2d 1027 (D. Colo. 2009)).   However, neither of these cases is
27   analogous to petitioner's facts.   In both cases, favorable defense rulings were based on newly
     discovered potentially exculpatory DNA evidence rather than the admission of alleged prejudicial
28   evidence.   *See Echols*, 373 S.W.3d at 896; *Masters*, 663 F. Supp. 2d at 1036.   Here, petitioner
     presents no DNA evidence that would exculpate him.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    Failure to Challenge Expert Testimony Linking Glove with Prints

Kathryn Novaes, a fingerprint analyst, testified on direct examination that bloody prints found on boxes at the crime scene were likely made by a fabric glove.  Dkt. No. 1-2 at 221.  This testimony supported the theory that petitioner wore a particular costume glove, which was found in the duffle bag with other bloodstained belongings of petitioner's, when he killed Ms. Vitale.  Petitioner argues that trial counsel was ineffective in failing to cross-examine Ms. Novaes on this issue and in failing to object that her testimony was beyond the scope of her expertise.  Dkt. No. 1-2 at 221.

Petitioner presented this argument to the California Court of Appeals as well as the California Supreme Court.  Dkt. No. 17-2, Exhs. 16, 20.  This Court presumes that the California Supreme Court, as the court producing the last state court decision, adjudicated the claim on the merits.  *Richter*, 562 U.S. at 99.

The California Supreme Court's decision on the merits was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Trial counsel did cross-examine Ms. Novaes and successfully elicited the fact that other fingerprints, matching neither petitioner's prints nor the fabric glove, were found on the boxes.  (12 RT 3323-24.)  The presence of a third party's fingerprints would be consistent with the theory that someone other than petitioner committed the murder.  Challenging Ms. Novaes's expertise concerning fabric patterns consistent with a glove print would not have created sufficient doubt to change the outcome of the trial and thus fails on the prejudice prong of the *Strickland* analysis.

### 5.    Failure to Challenge Information under Penal Code § 995

Petitioner also contends that trial counsel should have pursued a motion under California Penal Code § 995 to challenge the information that charged him with a special circumstance of burglary.  Dkt. No 1-1 at 222.  Section 995 provides that an "information shall be set aside by the court . . . [if] the defendant ha[s] been committed without reasonable or probable cause."  Cal. Penal Code § 995(a).  Petitioner asserts that there was insufficient evidence at the preliminary hearing to establish probable cause for a burglary charge and that trial counsel was ineffective for failing to

challenge this lack of evidence.

An information may be set aside only if there is no rational ground for assuming the possibility that the accused individual has committed the crime. *Rideout v. Superior Court*, 432 P.2d 197, 199 (Cal. 1967). "Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." *Id.* A § 995 motion should therefore be granted "only when there is a total absence of evidence to support a necessary element of the offense charged." *People v. Superior Court (Jurado)*, 6 Cal. Rptr. 2d 242, 245 (Cal. Ct. App. 1992).

As the superior court on habeas recognized, there was sufficient evidence at the preliminary hearing to support the inference that petitioner entered Ms. Vitale's home with the intent to steal her credit card information. *See* Habeas Order 18-19. The evidence included petitioner's plan to fraudulently purchase marijuana growing equipment, the scraps of paper containing neighbors' credit card information, and the piece of paper with the words "Knockout/Kidnap," "question," "Keep captive to confirm PINS," "dirty work," "dispose of evidense [sic]," and "cut up, bury." *Dyleski*, 2009 WL 1114077, at \*12. Because there was ample evidence to support a burglary charge, petitioner has not shown that trial counsel was ineffective in choosing not to pursue a § 995 motion.

## II.   Ineffective Assistance of Appellate Counsel Claims

Petitioner argues that appellate counsel, Phillip M. Brooks, was ineffective for his (1) failure to raise trial counsel's ineffectiveness for failing to exhaust all peremptory challenges; (2) failure to raise other ineffective assistance of trial counsel claims; and (3) failure to properly advise petitioner on possible post-conviction remedies. Dkt. No. 1-2 at 236-37.

### A.   Standard of Review

Petitioner's claim that appellate counsel was ineffective for failing to raise trial counsel's failure to exhaust all peremptory challenges is an indirect attempt to re-litigate whether it was error for the trial court to deny his change of venue motion. *Compare* Dkt. No. 17-2, Exh. 6 (appellant's opening brief to California Court of Appeal) *with* Dkt. No. 17-2, Exh. 16 (petition for

writ of habeas corpus to California Court of Appeal), Dkt. No. 1-1 (current petition). The California Court of Appeals considered this argument on the merits and concluded that the superior court did not err when it denied petitioner's motion for a change of venue.

Petitioner presented his current allegations of ineffective assistance of appellate counsel to the California Supreme Court.  Dkt. No. 17-2, Exhs. 20.  The Court summarily denied the petition. Dkt. No. 7.  The parties agree that petitioner has exhausted this claim.  Dkt. No. 17 at 2; Dkt. No. 7.

To determine whether appellate counsel's failure to raise a claim of ineffective assistance of trial counsel was objectively unreasonable and prejudicial, the district court must first assess the merits of the underlying claim that trial counsel provided constitutionally deficient performance. *Moormann v. Ryan*, 628 F.3d 1102, 1106-07 (9th Cir. 2010).  If trial counsel's performance was not objectively unreasonable or did not prejudice the petitioner, then appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel, and the petitioner was not prejudiced by appellate counsel's omission.  *Id.*

### B.    Applicable Law

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann*, 628 F.3d at 1106 (9th Cir. 2010).  First, petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106.  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106. Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).

"Establishing *Strickland* prejudice in the context of juror selection requires a showing that,

as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004) (citing *United States v. Quintero-Barraza*, 78 F.3d 1344, 1349 (9th Cir. 1995), *cert dismissed*, 545 U.S. 1165 (2005)).  The relevant test for determining whether a juror is biased is whether the juror had such fixed opinions that he or she could not impartially judge the defendant's guilt.  *Davis*, 384 F.3d at 643 (quoting *Quintero-Barraba*, 78 F.3d at 1349 (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)).

C.     **Analysis**

1.     **Failure to Raise Ineffective Assistance of Trial Counsel for Failure to Exhaust All Peremptory Challenges**

a.     ***Voir Dire* Factual Summary**

During *voir dire* all but two of the twelve jurors and four alternates chosen to serve on the jury said they had been exposed to some publicity about the case.  *People v. Dyleski*, No. A115725, 2009 WL 1114077, at *17 (Cal. Ct. App. April 27, 2009).  Of those, twelve jurors said they had not formed any opinion about the case as a result of the publicity, one said "Yes" he had formed an opinion, and one juror wrote in, "I don't know."  *Id.*  The California Court of Appeal set forth the factual background for each seated juror:

> Juror No. 1 was the sole juror who responded affirmatively to the question of whether he had formed any opinions about the case.  When questioned about his response *in camera* by the court and counsel, Juror No. 1 explained that he believed that the evidence at trial might trigger his memory of something he had read or heard—possibly about a personal item found in the house or some other "major thing"—that made it sound to him like the defendant was guilty.  He had not thought about the case since hearing about it the night of the murder and again a few days or weeks later when a neighbor was arrested, and he could not remember what it was he had heard on the news that caused him to have this reaction.  Whatever it was, Juror No. 1 thought he could set it aside, presume defendant innocent, and base his decision solely on the evidence at trial.
>
> Juror No. 2 stated that he had knowledge of the case through the radio, television, and newspapers.  There were "numerous, numerous times [he] heard it on the radio or read it in the newspaper."  He recalled that a prominent attorney's wife was killed and that a 17-year-old was being charged for the act.  He recalled an image of a couple who were living in a trailer and building a dream home that was up on a hill somewhere.  That was all he could remember about it.  He thought at the time that the coverage was being overly sensationalized because a prominent

lawyer was involved and due to the age of the person charged.  Juror No. 2 stated that he believed he could be objective in all cases, was the kind of person who liked to see and analyze the evidence before making up his mind about anything, and had not jumped to any conclusion about the guilt or innocence of the person charged.

Juror No. 3 stated that he had heard about the case from watching the news on TV while he was living in New York.  He remembered hearing Daniel Horowitz's name mentioned.

Juror No. 4 stated in her questionnaire that she had only read newspaper headlines about the case.  She was not questioned orally regarding publicity.

Juror No. 5 remembered reading about the murder in the Contra Costa Times and the San Francisco Chronicle at the time it happened, and that an "elderly lady" had been murdered in Lafayette.  He remembered there had possibly been a burglary, the defendant may have gone to collect something he had had sent to the house, and there had been "some signs or something left behind but [he could not] remember . . . what."  Juror No. 5 stated that he takes all news coverage "with a grain of salt."

Juror No. 6 had heard and read about the case from television new [sic] coverage and the Internet, and had talked about it with coworkers.  He followed the story "because it seemed kind of sensational," and he recalled that the victim had suffered repeated blows to the head and there was lots of blood.  He remembered something about the defendant taking a shower and getting a drink of water after the murder.  He remembered a high school picture of the defendant "in his Goth getup."  He had discussed with his friends the brutality of the crime and speculation that it had something to do with the victim's husband's work.  Juror No. 6 stated that the person who committed the crime was a sick person and he felt for the victim, but he understood he had to set that aside and base his decision on the evidence presented.  He believed he could presume defendant not guilty.  He was also struck by the defendant's young age and understood there was a difference between what had been in the news and what evidence had been collected.  Juror No. 6 stated that the case had disappeared from his mind once the coverage ended, and he had forgotten most of the specifics.

Juror No. 7 had not heard about the case "since last October or September," and it was not "on [his] radar."  He remembered that a "[h]igh school kid . . . murdered a wife or friend of some big-time lawyer.  That was pretty much it."  He affirmed that his job as a juror would be to presume that the defendant was innocent.  Juror No. 7 knew there was a youth involved, but he had no idea why the defendant was on trial and whether he was "walking down the street and happened to be in the wrong place at the wrong time."

Juror No. 8 stated in her questionnaire that she recalled reading and hearing about the case in newspapers and on television news.  She had mostly paid attention to it the previous fall.  She recognized the name of attorney Horowitz, but did not recognize the names of any of the other persons involved in the case.  She remembered that the victim was brutally murdered in her home by "repeated stab wounds," that her husband is a prominent attorney, and that clothes somehow led police to the defendant.  She vaguely remembered a picture of the defendant with longer hair.  She was surprised at the time that a teenager was arrested for the crime.

Juror No. 9 recalled "little bits and pieces" of the case from radio and television.

She recalled that a lady was found murdered in her home, and then a week or so later she heard the names of the people involved, including defendant's name. She recalled seeing a picture of the house and a few seconds of a picture of the defendant, but could not remember any further detail about the pictures. The story made her sad because the defendant was so young, and she felt bad for him and for the victim's family. She stated, "[D]eep in me I want to believe that he's innocent."

Juror No. 10, who stated that she had not seen, heard, or read about the case, was not questioned about publicity. Juror No. 11 remembered media reports that the perpetrator had stolen credit cards and bought things with them, but she was not certain about that. She also thought the case involved a plea of insanity. She did not recall seeing any pictures concerning the case. Juror No. 11 thought she could block everything out and listen to what is presented in court.

Juror No. 12 stated that he had seen some newspaper and TV coverage of the case intermittently after it happened. The last time he seen anything about it was "months" earlier.

*Dyleski*, 2009 WL 1114077, at *17-19 (alterations in original). The trial court found that, although some of the jurors were exposed to publicity and had retained vague or inaccurate information about the case, they "all indicated they could set aside such information and base their verdict solely on the evidence, and all understood their responsibility to presume the defendant innocent." *Id.* at *19. Similarly, the state appellate court found that there was not a reasonable likelihood that the defendant faced a jury that had prejudged the case against him. *Dyleski*, 2009 WL 1114077, at *23. Although several members were exposed to publicity, all of the jurors assured the court that they could sit as impartial jurors in this case. *Id.*

### b.     Analysis

As discussed above, petitioner presented his ineffective assistance of appellate counsel argument to the California Supreme Court, which summarily denied his petition. This Court presumes that the California Supreme Court, as the court producing the last state court decision, adjudicated the claim on the merits. *Richter*, 562 U.S. at 99.

The California Supreme Court's decision on the merits was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Strickland* prejudice has not been demonstrated because trial counsel's failure to exercise peremptory challenges did not result in the jury panel containing at least one juror who was biased. *See Davis*, 384 F.3d at 643. The trial court took the extra precaution of questioning each individual juror who had been

36

exposed to publicity surrounding the case to determine if they would be able to remain impartial. *Dyleski*, 2009 WL 1114077, at *17-19.   No juror indicated that he or she had formed a preconceived view of the case, and none refused to commit to remain objective and to listen to what was presented in court prior to reaching any conclusions about the case.  *Id.*  Juror No. 1 was the only juror who answered that he *may* have formed an opinion as a result of the publicity.  *Id.* at *17.  He was questioned further *in camera* by the court and by counsel.  *Id.*  Juror No. 1 stated that he believed that the evidence at trial *might* trigger his memory of something he had read or heard that made it sound to him like the defendant was guilty.  *Id.*  However, he could not remember what it was that he had heard to cause him to have this reaction, and whatever it was, he assured the court that "he could set it aside, presume defendant innocent, and base his decision solely on the evidence at trial." *Id.*

The statements made by the remaining jurors indicate that, although they had been exposed to publicity regarding the case, they had not formed any opinions about the defendant's guilt; they assured the court that they would be able to presume the defendant not guilty.  Juror No. 2 stated that he "was the kind of person who liked to see and analyze the evidence . . . and had not jumped to any conclusion about the guilt or innocence of the person charged."  *Id.*  Juror No. 3 had only heard about the case while watching the news on TV while he was in New York.  Juror. No. 4 had only read a newspaper headline about the case.  *Id.*  Juror No. 5 had read about the murder in local newspapers but stated that "he t[ook] all news coverage 'with a grain of salt.'"  *Id.*  Juror No. 6 had heard and read about the case from television news coverage and the internet but had forgotten most of the specifics after the coverage ended; he also stated that he understood that he had to set aside his prior feelings, base his decision on the evidence presented, and presume the defendant not guilty.  *Dyleski*, 2009 WL 1114077, at *18.  Juror No. 7 had heard about the case and remembered that a "[h]igh school kid . . . murdered a wife or friend of some big-time lawyer," but "affirmed that his job as a juror would be to presume that the defendant was innocent."  *Id.* (alterations in original) (internal quotations omitted).  Juror No. 8 had read and heard about the case in newspapers and on television news, but did not recognize any of the names of the persons involved other than the victim's husband.  *Id.*  Juror No. 9 recalled bits and pieces of the case from

radio and television; she explained that the story made her sad because the defendant was so young and stated that, "[D]eep in me I want to believe that he's innocent." *Id.* (alterations in original) (internal quotations omitted).  Juror No. 10 had not seen, heard, or read about the case. *Id.*  Juror No. 11 remembered some media reports but was not certain about the facts; she said that she could block everything out and listen to what was presented in court.  *Id.*  Juror No. 12 said that he had seen some newspaper and TV coverage intermittently but had not seen anything for months.  *Id.* at *19.  Although most of the jury had been exposed to publicity about the case, "pervasive publicity, without more, does not automatically result in an unfair trial."  *U.S. v. Guerrero*, 693 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted) (quoting *Seattle Times Co. v. U.S. Dist. Court*, 845 F.2d 1513, 1517 (9th Cir. 1988)); *cf. People v. Proctor*, 4 Cal.4th 499, 527 (Cal. 1992) (collecting cases where jury exposure to publicity failed to demonstrate prejudice).

As the California Supreme Court recognized, because petitioner has not shown that any of the jurors were actually biased, he cannot demonstrate that trial counsel's failure to exercise defendant's remaining peremptory challenges was prejudicial to petitioner.  *See Aguirre v. McEwen*, No. CV 10-7126, 2012 WL 3357215, at *20 (C.D. Cal. May 14, 2012) (rejecting claim of ineffective assistance of counsel for failure to strike jurors because the petitioner had failed to show that the jury ultimately selected included a biased juror); *Ayala v. Ayers*, No. 01cv741, 2008 WL 313817, *7-8 (S.D. Cal. Feb. 1, 2008) (same).  Appellate counsel's decision to forego raising a meritless claim was neither prejudicial nor deficient performance.  The California Supreme Court's resolution of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent because petitioner failed to meet both prongs of the *Strickland* standard for ineffective assistance of counsel.

### c.    Motion for a Change of Venue

In the present petition, in addition to challenging the representation of appellate and trial counsel with respect to the issue regarding venue, petitioner also argues the California Court of Appeal's decision was erroneous and he assails the appellate court's analysis of the issue.  Dkt. 1-

United States District Court
Northern District of California

2 at 242-55.  Petitioner asserts that the five factors in considering a change of venue motion enumerated in *Williams v. Superior Court*, 34 Cal.3d 584 (Cal. 1983) should be interpreted such that they weigh in favor of a change of venue.  *Id.* at 244-252.  Confusingly, petitioner places this argument within his ineffective assistance of appellate counsel argument, concluding that appellate counsel's failure to raise this meritorious issue "prevented . . . [p]etitioner from receiving appellate review of the erroneous denial of his meritorious motion for a change of venue."  *Id.* at 238.

Petitioner's argument challenges the merits of the California Court of Appeal's decision on the matter.  *See id.*  242-55. The AEDPA "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, __, 131 S.Ct. 13, 15 (2010) (per curiam) (quoting 28 U.S.C. § 2254(a)).  "[F]ederal habeas corpus relief does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

Petitioner is not entitled to habeas relief on this claim because this matter is outside the scope of federal habeas review.

### 2. Failure to Raise Numerous Other Ineffective Assistance of Trial Counsel Claims

Petitioner asserts that appellate counsel was ineffective because he failed to raise the ineffective assistance of trial counsel claims discussed in Section I(A).  Dkt. 1-2 at 236-37.  As discussed above, each of the ineffective assistance of trial counsel claims fails on one or both of the *Strickland* prongs.  Therefore, petitioner would not be able to show that he was prejudiced by appellate counsel's failure to present these ineffectiveness claims.

It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882 F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *See id.* at 1434.  The decision by appellate counsel not to raise these several

1     weaker issues did not fall below the objective standard of competent representation.   The

2     California Supreme Court's decision to deny petitioner's claim on this ground was not an

3     unreasonable application of, or contrary to, clearly established federal law.

4

5                              **3.       Failure to Adequately Advise**

6              Lastly, petitioner asserts that appellate counsel was ineffective because he did not properly

7     advise petitioner regarding possible post-conviction remedies.   Dkt. No. 1-2 at 237.   Petitioner

8     argues that appellate counsel was aware of the Turvey Report, which gave rise to an ethical

9     obligation to advise petitioner on possible habeas claims.   *Id.*   As previously mentioned, the

10    Turvey Report was the report generated by crime scene analyst Brent Turvey, who concluded that

11    some items in the home were not properly examined, that the available evidence was more

12    consistent with an anger motive than a profit motive, that the perpetrator exhibited care and

13    familiarity in the home, and that the DNA evidence implicating petitioner should have been

14    independently analyzed. *See supra* p. 21.   Petitioner alleges that "[appellate counsel] discouraged

15    [petitioner] from contacting a habeas attorney."   Dkt. No. 1-2 at 237.   Petitioner contends that this

16    failure to properly advise resulted in delays which "significantly reduced the amount of time

17    available to [present] habeas counsel to investigate potentially meritorious grounds for post-

18    conviction relief." *Id.*

19             As analyzed in section I(B)(1) of the Discussion section of this order, the Turvey Report is

20    speculative at best and fails to account for contradictory evidence.   The decision by appellate

21    counsel to forego weaker claims based on a speculative report would not fall below the objective

22    standard of competent representation.   Assuming *arguendo* that the Turvey Report was

23    sufficiently sound *and* it gave rise to appellate counsel's ethical obligation to advise *and* this

24    ethical obligation is cognizable as a matter of federal habeas review, the California Supreme

25    Court's decision on the merits on this issue was not contrary to, or an unreasonable application of,

26    clearly established federal law, because the letters petitioner advances do not demonstrate that

27    appellate counsel "discouraged" petitioner from contacting a habeas attorney.  *See* Dkt. 2, Exhs.

28    V, V1, V2.

In a letter dated May 26, 2010, appellate counsel informed petitioner that the "next step in [petitioner's] appeal will be to file a petition for habeas corpus in the United States District Court in San Francisco."  Dkt. 2, Exh. V.  In a follow-up letter dated June 27, 2010, appellate counsel explained that his appointment to represent petitioner in California had officially ended, advised petitioner that the statute of limitations was now running for a federal habeas corpus petition, and informed petitioner that May 23, 2011 was the filing deadline.  Dkt. 2, Exh. V1 at 1.  In response to petitioner's query, appellate counsel indicated that finding an attorney who specializes in habeas corpus "would be very helpful, but it is also potentially very expensive."  *Id.* at 2.  Appellate counsel suggested that it would be "worthwhile to ask the federal court to appoint counsel for you before attempting to retain someone privately" and offered to "put together a motion to the federal court for the appointment of counsel."  *Id.*

None of these statements demonstrate that appellate counsel intended to "discourage" petitioner from contacting a habeas attorney.  Appellate counsel indicated that retaining one would be helpful but cautioned that the expenses could be great and suggested an alternative means of retaining habeas counsel.  The decision whether or not to retain an attorney specializing in habeas corpus was ultimately left to petitioner.  Moreover, in a letter dated February 5, 2011, appellate counsel followed up with petitioner as petitioner's filing deadline was approaching.  Dkt. 2, Exh. V2.  The letter indicates that appellate counsel had not heard from petitioner since the June 2010 letter.  *Id.* at 1.  Appellate counsel provided an additional copy of the materials required to assist petitioner in filing his habeas petition and alerted him to proceed with haste as his deadline was fast approaching.  *Id.* at 1, 3.

Petitioner additionally contends that appellate counsel's failure to advise "significantly reduced the amount of time available to habeas counsel to investigate potentially meritorious grounds for post-conviction relief."  Dkt. 1-2 at 237.  However, the Court notes that Esther Fielding, petitioner's mother, contacted habeas counsel on February 28, 2011 (about three weeks after appellate counsel's letter reminding petitioner of his filing deadline).  There is no indication that petitioner was unaware of the May 23, 2011 filing deadline, as it was mentioned in the June 2010 and February 2011 letters.  Petitioner cannot fault appellate counsel for petitioner's choice to

wait until February 28, 2011 to contact habeas counsel.  Moreover, Kate Hallinan, one of the two habeas attorneys for petitioner, states in her declaration that "although we remained concerned about time . . . we felt that we could proceed."  Dkt. 1-2 at 270.  Hallinan further states that habeas counsel had "less than a two month window to review the records and files . . . and write and perfect the present petition."  Dkt. 1-2 at 270.  Petitioner is not entitled to habeas relief on this claim.

### III.   Prosecutorial Misconduct Claim

Petitioner alleges that the prosecutor's misconduct violated his Fourteenth Amendment rights to a fair trial and to due process of law.  Dkt. No. 1-1 at 223.  Specifically, petitioner contends that the prosecutor: (1) weaved a "Gothic theme" into petitioner's case to arouse feelings of passion and prejudice among the jurors; (2) misrepresented physical evidence; (3) referred to facts not in evidence; (4) repeatedly posed improper questions; (5) improperly commented on petitioner's decision not to testify; and (6) inappropriately appealed to the sympathy of the jurors.  Dkt. No. 1-1 at 223-230; Dkt. No. 1-2 at 231-236.  Petitioner presented the prosecutorial misconduct claims he currently alleges to the California Supreme Court on habeas.  The California Supreme Court summarily denied petitioner's claims.  Dkt. 17-2, Exhs. 20, 21.  The parties agree that petitioner has exhausted this claim.  Dkt. No. 17 at 2; Dkt. No. 7.  This Court presumes that the California Supreme Court, as the court producing the last state court decision, adjudicated the claim on the merits.  *Richter*, 562 U.S. at 99.

### A.   Applicable Law

Prosecutorial misconduct is cognizable in federal habeas corpus, but "[i]mproper argument does not, *per se*, violate a defendant's constitutional rights."  *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002), *opinion amended*, 315 F.3d 1062 (9th Cir. 2002) (quoting *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996)).  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct

United States District Court
Northern District of California

United States District Court
Northern District of California

renders a trial "fundamentally unfair." *Id.*; *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes).  A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotations and citation omitted); *see also Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

When examining whether misconduct amounted to a violation of due process, a court must determine whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 182; *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges.").  This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant.  *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury received instructions five different times to consider only the evidence presented, and not its sympathy for the victim's life story).

### B.     Analysis

Petitioner has not shown that the California Supreme Court's denial of the prosecutorial misconduct claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562

U.S. at 103.

**1.  The Prosecutor Did Not Improperly Arouse Feelings of Passion and Prejudice Among the Jurors**

Petitioner alleges that the prosecutor wove a "Gothic theme" into his case to arouse feelings of passion and prejudice among the jurors.  Dkt. No. 1-1 at 224.  For example, during *voir dire*, the prosecutor stated the following:

> Q: Okay.  Is there — I have to ask you this question:  Has anybody here — and let me limit it again to immediate family — ever done any studying or showed a special interest in — and I'm not talking about just reading, you know, Silence of the Lambs — but I'm talking about showing a special interest in subject matters such as, you know, psychotic killers, mass murderers, Jack the Ripper, sadomasochism, anything like that?

(4 RT 1063.)

Petitioner further argues that there were many other instances in which "Goth" was discussed.  Dkt. No 1-1 at 225-28.  Petitioner cites an instance that took place during the prosecutor's opening statement where the prosecutor described petitioner's behavior after petitioner's sister died in a car accident:

> He started wearing black.  It's been characterized as "Goth," you have been getting a lot of questions regarding Goth . . . it's not so much Goth  or what Goth is that has anything to do with his case, what it does have to do with is black, for instance, black clothing, okay, that's going to become relevant.
>
> But there's something else; because it's not just the style, Mr. Dylseki is something of an artist and he likes to write as well. And you are going to see a number of pieces of artwork, and you are going to read a number of his pieces of writing, and you are going to see some things that are going to be disturbing to you.  It wasn't Goth and it wasn't even death, it was murder, it was killing.  We have all kinds of very disturbing pieces of art that have very frightening images on them with blood, with the word murder, with vivisection, something that appears prominently on his computer which is the removal of organs.
>
> Okay. And perhaps while the content of that artwork and those writings may give something of a window into the heart and mind of Scott Dyleski, there's something else about those writings that's very important, because Mr. Dyleski was big into symbols.

(7 RT 1742-1743.)

United States District Court
Northern District of California

1    Petitioner argues that the prosecutor also made inappropriate statements when eliciting

2    testimony from Esther Fielding and during closing arguments, including remarks that referred to

3    the 'H' shaped symbol that was etched into Vitale's back, in addition to the following comment:

4    "Hate is a part of this case and it manifests itself in the person of the defendant both

5    philosophically and at a personal level."  Dkt. No. 1-1 at 227.  The statements made during

6    opening and closing arguments, according to petitioner, were inflammatory and lacked probative

7    value.  Dkt. No. 1-1 at 227-29.

8        The prosecutor's remarks during his opening statement concerning petitioner's writings

9    and artwork were relevant to determining the identity of the perpetrator, given that the prosecution

10   would and eventually did present evidence of the "H" symbol etched into Vitale's back.  The

11   comments concerning petitioner's black wardrobe were also relevant to proving the identity of the

12   perpetrator, given the black glove, dark sweater pullover, and blue ski mask found in a duffle bag

13   in petitioner's mother's abandoned Toyota van.  *See Dyleski*, No. A115725, 2009 WL 1114077, at

14   *11.  The duffle bag, black glove, and blue ski mask were later determined to contain the victim's

15   DNA.  *Id.* at *12.

16       Additionally, the prosecutor's arguments concerning "hate" and how it "manifests itself in

17   the person of the defendant both philosophically and at a personal level" challenged testimony

18   from defense witnesses, such as Fielding, who characterized petitioner in a positive light.  (14 RT

19   3854-55, 3869-71, 3875, 3895, 3899, 3902, 3906-07.)  The trial court instructed the jurors that

20   they were not to be influenced by passion or prejudice, and that the prosecutor's arguments were

21   not to be considered as evidence.  (15 RT 4171-72.)

22       Petitioner has not demonstrated that the state court's denial of this claim was an

23   unreasonable application of, or contrary to, existing United States Supreme Court precedent.

24

25           **2.     The Prosecutor Did Not Misrepresent Physical Evidence**

26       Petitioner next argues that the prosecutor misrepresented information about numerous

27   items of physical evidence, including (1) the shower, (2) the glove, (3) the knife, and (4)

28   presumptive blood test results.  Dkt. No. 1-1 at 229-230; Dkt. No. 1-2 at 230-232.  Petitioner has

1   not demonstrated that the California State Supreme Court's resolution of this issue was contrary

2   to, or an unreasonable application of, clearly established federal law, because the prosecutor

3   simply did not misrepresent the physical evidence.

4

5               **a.   The Shower**

6           Petitioner contends that the prosecutor misrepresented evidence because he alluded to the

7   fact that the killer did not take a shower.  Dkt. No. 1-1 at 229.  Specifically, petitioner takes issue

8   with the following statement by the prosecutor during his closing argument: "[T]he cast-off from

9   your body, if you are taking a shower, it's going to start to drip and you are going to get drips of

10  blood; but that shower was never run." (15 RT 4055.)  Petitioner quotes the following language

11  from Criminalist Alex Taflya's Report ("Taflya Report") to support his assertion that the

12  prosecutor misrepresented the evidence:  "The suspect appeared to have showered and a bloody

13  handprint was observed on the shower wall." Dkt. No. 2-32, Exh. DD.  In actuality, this statement

14  was Taflya's summary of what the Detective at the scene of the crime had said to Taflya when

15  Taflya arrived to the scene.  Taflya was repeating the words of another person, and actually opined

16  during trial that the killer *did not* use the shower.  (8 RT 2059.) ("[T]he shower was not used.").

17  Petitioner's argument is therefore misplaced.  Based on Taflya's actual testimony, it was

18  reasonable for the prosecutor to argue that the person who committed the murder did not use the

19  shower.

20          Whether the shower was used by the killer or not was to be determined by the jury, as

21  instructed by the court.  (15 RT 4171.) ("[Y]ou must determine what facts have been proved form

22  the evidence received in the trial and not from any other source.")

23          It was not unreasonable for the prosecutor to assert that the killer did not take a shower

24  based on the evidence adduced at trial, and the state court's resolution of this issue was not "so

25  lacking in justification that there was an error well understood and comprehended in existing

26  federal law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

27

28

### b.      The Glove

Petitioner next argues that the prosecutor misrepresented facts about the black glove that was found in the duffel bag discovered by Reserve Deputy Rick Kovar.  Dkt. No. 1-1 at 230. Petitioner believes that the prosecutor improperly created an impression that the glove, which contained Vitale's DNA, belonged to petitioner, that the glove was used in the murder, and that there was a missing glove that had yet to be found.  *Id.*  But petitioner does not cite any statements from the record to support his assertion.  In actuality, the prosecutor's statements concerning the glove were well-founded based on the testimony elicited at trial.

Kovar testified that he found a glove inside the duffle bag that he discovered while searching Fielding's abandoned van.  (9 RT 2332.)  Fielding testified that on the Monday after the murder she saw the duffle bag inside of the van, she believed the duffle bag belonged to petitioner, petitioner had mentioned something about old clothes, and petitioner used words to the effect that he had left the duffle bag inside the van.  (11 RT 3101, 3111-3112, 3118.)  Petitioner's name was found on an airline tag from December 2003 that was attached to the handle of the duffle bag.  (12 RT 3399; 13 RT 3481.)  Additionally, Criminalist David Stockwell testified that DNA samples collected from the glove matched Pamela Vitale.  (13 RT 3640.)

In short, the testimony provided a reasonable basis for the prosecutor to argue that the glove found in the duffle bag had been used in the murder.  It is not clear from the record that the prosecutor left the impression that another glove was used in the murder and had not been found. Even if the prosecutor did leave such an impression, it would be supported by Fielding's testimony, where she stated that she had purchased *gloves* similar to the *one* found in the duffle bag.  (12 RT 3188-3189.)  Lastly, petitioner's claim that even defense counsel was confused by the prosecutor's alleged reference to a missing glove is without merit.  Defense counsel repeatedly alluded to a single glove during her closing argument.  (*See, e.g.*, 15 RT 4123.)  The prosecutor's comment did not so infect the trial with unfairness as to make the resulting conviction a denial of due process, and the state court's resolution of this issue was not "so lacking in justification that there was an error well understood and comprehended in existing federal law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

1

2                            c.      **The Knife**

3          Petitioner next contends that the prosecutor made improper statements concerning a knife

4    turned over by petitioner's mother to the authorities.  Dkt. No. 1-1 at 230; Dkt. No. 1-2 at 231.

5    Petitioner argues that during the prosecutor's closing argument he referred to the knife as if it were

6    connected to the murder of Vitale, even though no evidence suggested that the knife was

7    connected to the murder.  Dkt. No. 1-2 at 231.

8          During his closing argument, the prosecutor discussed the situation in which petitioner's

9    girlfriend, Jenna, drove petitioner's backpack and other possessions to petitioner's mother, Esther,

10   in Bolinas.  (15 RT 4081.)   Petitioner's backpack contained "scraps of paper with credit card

11   account numbers and names . . . as well as a date book or journal, a box of gloves, two pairs of

12   pants, three shirts, a pair of [Land's End] shoes, movies, an external hard drive, a book on mass

13   murder and cult leaders, *a knife*, and empty bottles of absinthe."  *Dyleski*, 2009 WL 1114077 at

14   *11 (emphasis added).  One of the shirts found in the backpack contained possible blood evidence.

15   *Id.*  Moreover, "[t]he general pattern of the Land's End shoe was the same as the general pattern of

16   the shoe print found on the plastic storage bin lid found at the murder scene."  *Id.*  The shoes were

17   identified as petitioner's and were the same as those he wore to the Renaissance Faire with his

18   girlfriend on the day after the murder.  *Id.*

19         Based on this evidence, the prosecutor stated the following:

20

21              What's most significant to the people is that after all of that, he
                gives all of this stuff to Jenna.  Now, Esther's explanation is that
22              what he's doing and certainly what her intent was [was] to have him
                get rid of things that are associated with the credit card fraud.

23              But there are items that he was getting rid of that have nothing to do
24              with credit card fraud.  That knife has nothing to do with credit card
                fraud.  I would submit to you the shoes have nothing to do with
25              credit card fraud.

26              (15 RT 4081.)

27         The prosecutor's statement about the knife was reasonable given the evidence related to

28   the other items that were discovered in petitioner's backpack.  While it can be inferred that the

United States District Court
Northern District of California

48

scraps of paper with credit card account numbers and names were connected to the credit card fraud, it could reasonably be argued that the pair of Land's End shoes, the book on mass murder and cult leaders, and the knife were not related to credit card fraud.  The prosecutor did not suggest that the knife was used as the murder weapon; he merely suggested that the knife was not related to the credit card fraud, which was reasonable in light of the other items found in the backpack.  While it is true that (1) three "intersecting superficial incisions" were found on Vitale's back, and that (2) Vitale suffered a deep abdominal stab wound, the prosecutor never suggested that the knife found in petitioner's backpack was the cause of these injuries.

Even if the prosecutor improperly suggested that the knife was connected to the murder, this statement did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.  As previously mentioned, the trial court instructed the jury to "determine what facts have been proved from the evidence received in the trial and not from any other source," and that "[s]tatements made by the attorneys during the trial are not evidence." (15 RT 4171-72.)  The Supreme Court has held that such limiting instructions are presumed to be effective.  *See Darden*, 477 U.S. at 181-183 (finding that prosecutor's improper statements did not deprive Darden of a fair trial, partly because the trial court instructed the jury that the arguments made by counsel were not evidence).  Additionally, the Ninth Circuit has found that instructions to jurors explaining that statements made by attorneys are not evidence are presumed to have been followed.  *See Runningeagle v. Ryan*, 686 F.3d 758, 781 (9th Cir. 2012) (finding state court's holding that no due process violation occurred was not unreasonable, partly because the trial court "repeatedly instructed the jury that the attorney's arguments were not evidence");  *Allen v. Woodford*, 395 F.3d 979, 997 (9th Cir. 2005) ("[G]iven the trial court's instruction that statements by counsel were not evidence, and given the weight of the evidence against him, the prosecutor's comments did not deprive Allen of a fair trial.")

The prosecutor's comments did not render petitioner's trial fundamentally unfair, and the state court's resolution of this issue was not "so lacking in justification that there was an error well understood and comprehended in existing federal law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

United States District Court
Northern District of California

1

2

### d.    Referring to Presumptive Test Results as Blood

3          Petitioner next alleges that the prosecutor engaged in misconduct by referring to

4  "presumptive" test results as blood.  Dkt. No. 1-2 at 231.  Specifically, regarding items that were

5  found in the duffle bag that was discovered in Fielding's van, petitioner argues that the prosecutor

6  erred in his opening statement by remarking, "On the shirt Pamela's blood wasn't there, but the

7  defendant's was.  The same with the overcoat."  Dkt. No. 1 at 231; (7 RT 1776.)  Petitioner

8  contends that "there was no evidence of any further analysis on the overcoat, and therefore no

9  evidence whatsoever that it contained Petitioner's blood, rather than sweat or skin cells from

10 normal usage." Dkt. No. 1-2 at 231.  Petitioner further argues that the prosecutor played "'fast and

11 loose' with regard to the presumptive screening for the presence of blood" during questioning of a

12 witness, notwithstanding defense objection.  *Id.*; (12 RT 3277-3286.)

13         As the California Supreme Court recognized in its summary denial, petitioner's argument

14 misses the mark because California law considers presumptive blood tests admissible evidence.  In

15 *People v. Alexander*, 49 Cal. 4th 846, 904-905 (2010), the California Supreme Court ruled that

16 testimony regarding presumptive blood tests is admissible when the presumptive blood tests "had

17 no particular emotional component, nor did it consume an unjustified amount of time."  The Court

18 in *Alexander* also stated that, "because the defense *fully explored the limitations* of the

19 presumptive tests through cross-examination, there is no likelihood this evidence confused or

20 misled the jury.  The trial court did not err, and defendant's constitutional rights were not

21 violated."  *Id.* (emphasis added).  Here, criminalist Eric Collins testified that a portion of the

22 overcoat tested presumptively positive for blood, noting that areas of the coat "responded

23 fluorescently" when examined.  (13 RT 3452.)  A review of the record reveals that petitioner's

24 defense counsel objected to the admissibility of presumptive tests, generally.  (12 RT 3279.)

25 Additionally, after the trial court declined to sustain defense counsel's objection, defense counsel

26 was able to elicit from Collins on cross-examination that presumptive tests of blood were not

27 conclusive. (12 RT 3282.)  Thus, as the trial court acknowledged, any potential issues concerning

28 presumptive blood tests involve the weight the jury should give the tests, as opposed to their

United States District Court
Northern District of California

1  admissibility.  (12 RT 3284.)

2      The prosecutor's comments regarding presumptive blood tests were not improper given

3  that the statements made were based on a reasonable inference derived from admissible evidence.

4  The prosecutor's remarks did not violate petitioner's right to due process, and the state court's

5  resolution of this issue was not "so lacking in justification that there was an error well understood

6  and comprehended in existing federal law beyond any possibility for fairminded disagreement."

7  *Richter*, 562 U.S. at 103.

8

9          **3.      The Prosecutor's Reference to Facts Not In Evidence.**

10     Petitioner argues that the prosecutor referred to facts not in evidence during his closing

11 argument.  Dkt. No. 1-2 at 232.  Specifically, petitioner contends that the prosecutor improperly

12 referenced a bumper sticker that contained an "anti-Christian" message, the word "hate," and an

13 image that showed an H with an "elongated horizontal line" that was similar to the symbol etched

14 into Ms. Vitale's back.  *Id.*

15     As the California Supreme Court recognized in summarily denying petitioner's claim, even

16 if the bumper sticker was not admitted into evidence, the misstatement did not amount to a

17 violation of due process.  The trial court instructed the jurors that they were to base their decision

18 on the evidence and that the statements of the attorneys were not evidence.  (15 RT 4172-73.)

19 Moreover, there were other of petitioner's personal effects that contained symbols or renderings

20 that the prosecution called to the jury's attention.  (13 RT 3511, 3516, 3521-3523.)  Additionally,

21 defense counsel attacked the prosecution's theory that symbols found in petitioner's writings and

22 artwork necessarily implicated him in the murder.  (15 RT 4134.)   Again, the state court's

23 resolution of any possible prejudicial effect of the prosecutor's statements in this respect was not

24 so lacking in justification that there was an error well understood and comprehended in existing

25 federal law.

26

27         **4.      The Prosecutor Did Not Engage In Improper Questioning.**

28     Petitioner contends that the prosecutor engaged in improper questioning during his

United States District Court
Northern District of California

questioning of criminalist Alex Taflya.  Dkt. No. 1-2 at 232-233.  Improper questioning of a witness by the prosecutor is not alone sufficient to warrant reversal.  Rather, the relevant inquiry on habeas is that dictated by *Darden*, 477 U.S. at 181, *i.e.*, whether the prosecutor's behavior so infected the trial with unfairness as to make the resulting conviction a denial of due process.  *See Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998).  In considering whether the questioning deprived the defendant of a fair trial, the witness' testimony should be viewed as a whole to determine the impact of the improper questioning.  *See id.* at 934-35 (prosecutor's questioning witness as to whether she was afraid of defendant did not render the proceedings fundamentally unfair in light of witness' other testimony that defendant murdered her mother, stabbed her sister, stabbed her, and then tried to burn down their house while the victims were still inside).

Although petitioner's defense counsel objected to the prosecutor's leading questions on four separate occasions, all of which were sustained by the trial court, petitioner argues that the prosecutor continued to pose inappropriate questions even after being admonished by the trial court.  Dkt. No. 1-2 at 232-33; (7 RT 1978-1979.)  Subsequent to being warned by the trial court to cease asking Taflya leading questions, the prosecutor engaged in the following dialogue with Taflya:

> Q.  Isn't that a pattern you are familiar with, the pattern of the carpet?
>
> A.  After looking at it, yes.  I don't believe I have seen that in the past, well, prior to coming into this home.
>
> (7 RT 1985.)

Petitioner's defense counsel did not object to the above question, nor did the trial court intervene in any manner.  A lack of objection signifies tacit approval of the question, especially in light of the trial court's previous warning to counsel regarding leading questions.  The state court reasonably could have determined that the prosecutor's question was not so egregious that it infected the trial with prejudice and unfairness.

### 5.     The Prosecutor Did Not Improperly Comment on Petitioner's Decision Not to Testify.

Petitioner also argues that the prosecutor committed a *Griffin* error by improperly commenting on petitioner's decision not to testify.  Dkt. No. 1-2 at 233.  Where a prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, or to treat the defendant's silence as substantive evidence of guilt, the defendant's privilege against compulsory self-incrimination is violated.  *See Griffin v. California*, 380 U.S. 609, 615 (1965).  While it is proper for the prosecution to address the defense's arguments, a comment is impermissible if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.  *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (citing *United States v. Bagley*, 772 F.2d 482, 494 (9th Cir. 1985), *cert. denied*, 475 U.S. 1023 (1986)).

However, such commentary by the prosecutor requires reversal only if "(1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction; and (3) where there is evidence that could have supported acquittal."  *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994).  Put differently, such improper commentary warrants reversal only if it appears that it may have affected the verdict.  *See Lincoln*, 807 F.2d at 809; *see also United States v. Rodriguez-Preciado*,  399 F.3d 1118, 1132 (9th Cir. 2005), *amended*, 416 F.3d 939 (9th Cir. 2005) (holding that comment on the defense's failure to explain introduced testimony or evidence does not infringe on defendant's Fifth Amendment rights).

Petitioner points to two passages from the prosecutor's closing argument in support of this claim.  Dkt. No. 1-2 at 233-235.  First, in discussing the "stupid lie" that petitioner fabricated when he was confronted about DNA by Fred Curiel, the prosecutor argued:

> Well, if this is just some stupid lie then where, sir, did you get those scratches? Okay. And the other $64,000 question is, "If this was just a stupid lie, why are you worried about DNA?"  Let me repeat that. :Why are you worried about DNA? Your explanation for the DNA possibly being on Pamela Vitale's body is this mysterious woman you ran into on the road.  If that's a stupid lie, then there's absolutely no reason for you to be concerned about your DNA being on Pamela Vitale's body," save one, and that's because, like Fred

said, "You were there."

(15 RT 4087.)

Second, the prosecutor commented on petitioner's claim of possessing an alibi:

> But what time in the morning?  How is it that you think you have an alibi on Tuesday?  I mean let's not forget, folks, that nobody saw the defendant.  If they saw him at 9:26, nobody saw him before that.  There isn't one witness who testified they saw the defendant before then, directly or indirectly.
>
> Dan Horowitz left before 8:00 o'clock.  Exactly how is it that you know that Pamela Vitale was not killed between 8:00 and 9:26?  What exactly, what time is it that you, Scott Dyleski, think you have an alibi for?  That's pretty important to the people.

(15 RT 4089.)

However, a few sentences after the prosecutor's discussion of petitioner's alibi, the prosecutor stated the following:

> But in the context of his denials as he's talking about it, according to Jena, she says that he is maturely weighing his options, and he recognizes that if he gets blamed for the credit card fraud he will get blamed for the murder and spend the rest of his life in prison.  That's what he tells Jena.
>
> Well, that's very interesting.  How is it that you know there's a connection here and why is it you are so concerned about it, that you might think maturely and meaningfully reflecting on it that you are going to go to prison for the rest of your life, because of the 1901 entry on the Karen Schneider order?  No.  What he's concerned about, what he's still concerned about is DNA.

(15 RT 4089-90.)

Analyzing these statements in context, the state court reasonably could have determined that the prosecutor was not commenting on petitioner's failure to testify, and instead was using the rhetorical question format to poke holes in petitioner's suspicious pre-arrest explanations regarding certain events related to the murder, which does not amount to misconduct. The prosecutor did not stress or emphasize petitioner's decision not to testify, nor was the alleged inappropriate commentary extensive. *Jeffries*, 5 F.3d at 1192.  Defense counsel did not object to the prosecutor's monologue.  Moreover, the Supreme Court has noted that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or

United States District Court
Northern District of California

that a jury, sitting through lengthy exhortation, will draw the meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  The state court's resolution of the prosecutorial misconduct claim "was not so lacking in justification that there was an error well understood and comprehended in existing federal law." *Richter*, 562 U.S. at 103.

### 6.      The Prosecutor's Asserted Appeals to the Jury's Sympathy.

Lastly, petitioner contends that the prosecutor improperly appealed to the jury's sympathy, violating what is colloquially known as the "Golden Rule."  Dkt. No. 1-2 at 235.  A "Golden Rule" argument is "a jury argument in which a lawyer asks the jurors to reach a verdict by imagining themselves or someone they care about in the place of the injured plaintiff or crime victim." 75A Am. Jur. 2d Trial § 547.  The '"Golden Rule" argument is generally impermissible "because it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Id.*

Petitioner expresses multiple points of contention regarding this issue.  Dkt. No. 1-2 at 235-36.  First, petitioner argues that during jury selection, the prosecutor inappropriately spoke of the "mental gymnastics" that a juror must go through in order put aside his or her emotions.  *Id.*; (3 RT 661.)  A review of that statement in context reveals that the prosecutor was referring to the emotional battle that a juror will go through by participating in a trial generally; the prosecutor was not inflaming jury passions in order to secure a guilty verdict.

Second, petitioner contends that during closing argument, the prosecutor improperly referred to the personal characteristics of Vitale by saying, "I hope you remember that as you are reflecting on the evidence in this case, that she is about as innocent a victim as you can have in a criminal case," and by characterizing Vitale as "a woman that virtually everybody in that neighborhood loved or certainly liked."  Dkt. No. 1-2 at 235-36; (15 RT 3999); (15 RT 4010.) These references about Vitale were not appeals to the jury's sympathy; they were reasonable and proper comments on the evidence and testimony adduced at trial.  For example, during direct examination, a witness described Vitale as a "very lovely person" who was "very friendly with

1    everyone." (7 RT 1843.)

2         Lastly, petitioner disagrees with and partially cites another statement made by the

3    prosecutor during his closing argument, which the Court quotes in its entirety here:

4

5              What does Pamela do when she's sitting on that couch, somebody
               walks in?  Imagine the vision presented to the senses of Pamela
6              Vitale when a masked person — and I'm going to get into the mask.
               But Ladies and Gentlemen, there can be no question whatsoever that
7              this person was wearing a mask and gloves at the time he entered
               this house and that is what Pamela is confronted with as she is in a
8              completely different world, looking into her family tree.

9         Dkt. No. 1-2; (15 RT 4041-42.)

10        The prosecutor's suggestion to the jury to imagine "the vision presented to the senses of

11   Pamela Vitale," may be an impermissible invitation to the jurors to place themselves in the shoes

12   of the victim.  *See also Fields*, 309 F.3d at 1109 (finding prosecutor's request to "think of yourself

13   as [the victim]" inappropriate but not amounting to a due process violation).  By asking the jury to

14   imagine Vitale's perspective, the prosecutor "inappropriately obscured the fact that his role is to

15   vindicate the public's interest in punishing the crime, not to exact revenge on behalf of an

16   individual victim."  *Fields*, 309 F.3d at 1109 (quoting *Drayden v. White*, 232 F.3d 704, 712-13

17   (9th Cir. 2000)).

18        However, the state court reasonably could have determined that these several comments

19   did not so infect the trial with unfairness as to deprive the petitioner of his right to due process.

20   *See Darden*, 477 U.S. at 183.  "The arguments of counsel are generally accorded less weight by

21   the jury than the court's instructions and must be judged in the context of the entire argument and

22   the instructions."  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) (citing *Boyde v.*

23   *California*, 494 U.S. 370, 384 (1990)).  The prosecutor's comments were isolated and were only a

24   small part of the closing argument.  Moreover, the jury was instructed by the trial court to not be

25   "influenced by sentiment, conjecture, sympathy, passion, or prejudice," and that "statements made

26   by the attorneys are not evidence."  (15 RT 4172.)

27

28

United States District Court
Northern District of California

### 7.   Conclusion

For the reasons set forth above, the Court finds that the California Supreme Court's rejection of petitioner's claims for prosecutorial misconduct was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d).

## IV.   Cumulative Effect of Errors

Petitioner argues that even if no single error was sufficiently prejudicial, that the cumulative effect of the alleged errors warrants relief. Dkt. No. 1-2 at 256. Petitioner's argument lacks merit, however, because as the California Supreme Court recognized, there are no errors in this case to accumulate.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). "The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03 (1973)). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

As the California Supreme Court summarily concluded, none of the allegations that petitioner advances amount to constitutional violations. Petitioner's allegations of ineffective assistance of trial counsel and prosecutorial misconduct do not rise to the level of a constitutional violation, "even when considered in the aggregate." *See Wood v. Ryan*, 693 F.3d 1104, 1117 (9th Cir. 2012).

United States District Court
Northern District of California

### V.      Constitutionality of Penal Code § 190.5

As he did on direct appeal to the California Court of Appeal, petitioner argues that California Penal Code § 190.5(b) is unconstitutionally vague because the statute does not make clear whether the court has equal discretion to impose a sentence of 25 years to life or LWOP, or whether there is a presumption favoring LWOP.  Dkt. No. 1-2 at 258.  Petitioner also renews his argument that California Penal Code § 190.5(b) is unconstitutional under the Eighth Amendment's prohibition on cruel and unusual punishment and runs afoul rationale of *Miller v. Alabama*, 132 S. Ct. 2455 (2012) and *Graham v. Florida*, 560 U.S. 48 (2010) because petitioner was 16 years old when the crime was committed.  Dkt. No. 1-2 at 257-266.

The California Supreme Court originally held petitioner's state habeas claim pending the outcome of *People v. Gutierrez*, 58 Cal. 4th 1354, 1360 (2014), and dismissed the petition on March 13, 2013 without prejudice to petitioner filing an original action following that court's decision in *Gutierrez*—which ultimately issued on May 5, 2014.  Dkt. No. 7; *see Gutierrez*, 58 Cal. 4th at 1354.  In the interim, petitioner prematurely moved this Court on April 10, 2013 to lift the stay that was imposed pending the resolution of petitioner's habeas petition before the California Supreme Court, claiming that his state habeas claims were exhausted.  Dkt. No. 7.  Respondent did not oppose this request and later informed the Court that "[p]etitioner ha[d] exhausted state remedies for the claims in his petition."  Dkt. No. 17.  Petitioner's unopposed request to lift the stay was granted.  Dkt. Nos. 7, 8.

Petitioner had in fact not exhausted his state remedies at that time and to-date has not pursued his state law remedy for potential resentencing pursuant to the United States Supreme Court's decision in *Miller v. Alabama*, 132 S.Ct. 2455 (2012), the California Supreme Court's decision in *People v. Gutierrez*, 58 Cal. 4th 1354 (Cal. 2014), the United States Supreme Court's decision in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the California Court of Appeal's decision in *People v. Berg*, 2016 WL 2854322 (Cal. Ct. App. May 12, 2016), and the forthcoming California Supreme Court decision in *In re Kirchner*, 244 Cal. App. 4th 1398 (Cal. App. 2016), *review granted*, 2016 WL 2908028 (Cal. May 18, 2016).

"An applicant shall not be deemed to have exhausted the remedies available in the courts

United States District Court
Northern District of California

1    of the State . . . if he has the right under the law of the State to raise, by any available procedure,

2    the question presented."  28 U.S.C. § 2254(b)(3).  The United States Supreme Court has cautioned

3    that the exhaustion doctrine is principally designed to protect the state courts' role in the

4    enforcement of federal law and prevent disruption of state judicial proceedings.  *See Braden v.*

5    *30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490-491 (1973).  While it is true that the

6    federal and state courts are equally bound to guard and protect rights secured by the Constitution,

7    "it would be unseemly in our dual system of government for a federal district court to upset a state

8    court conviction without [providing] an opportunity to the state courts to correct a constitutional

9    violation."  *Rose v. Lundy*, 455 U.S. 509, 518 (1982) (citations omitted); *see also Duckworth v.*

10   *Serrano*, 454 U.S. 1, 3 (1981) (noting that the exhaustion requirement "serves to minimize friction

11   between our federal and state systems of justice by allowing the State an initial opportunity to pass

12   upon and correct alleged violations of prisoners' federal rights").

13         The California Supreme Court in *Gutierrez* held that § 190.5(b) of the California Penal

14   Code gives a sentencing court the discretion to impose either LWOP or a term of 25 years to life

15   on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in

16   favor of LWOP.  *Gutierrez*, 58 Cal.4th at 1387.  The *Gutierrez* court explicitly disapproved of

17   *People v. Guinn*, 28 Cal. App. 4th 1130 (Cal. App. 1994)—the case the Court of Appeal relied on

18   in petitioner's own appeal—in which the California Court of Appeal interpreted § 190.5(b) to

19   mean "that 16 or 17-year-olds who commit special circumstance murder must be sentenced to

20   LWOP, unless the court, in its discretion, finds good reason to choose the less severe sentence of

21   25 years to life."  *Guinn*, 28 Cal. App. 4th at 1141.  The *Gutierrez* court concluded that this

22   presumption of LWOP as stated in *Guinn* would raise serious constitutional concerns in light of

23   *Miller v. Alabama*, 132 S.Ct. 2455, 2469, (2012), in which the Supreme Court held that the Eighth

24   Amendment forbids a sentencing statute that requires a sentence of LWOP for juvenile offenders.

25   *See also Montgomery v. Louisiana*, __ U.S. __, 2016 WL 280758 (U.S. Jan. 25, 2016) (holding

26   that *Miller v. Alabama* announced a new substantive constitutional rule that was retroactive in

27   state habeas review).

28         The California Court of Appeal recently decided in *In re Kirchner* that, in light of the

59

United States District Court
Northern District of California

1   holding in *Montgomery*, inmates such as petitioner, who are serving LWOP sentences for crimes

2   they committed while they were juveniles, are entitled to the benefits of *Miller*, even though their

3   judgments of conviction are final. *See I*

4   *n re Kirchner*, 244 Cal. App. 4th at 1412. The court in *Kirchner* underscored that, "where a

5   prisoner is serving an LWOP sentence for a crime committed while he or she was a juvenile, and

6   at the time of his or her sentence the trial judge failed to employ the procedures required by *Miller*,

7   his or her sentence is presumptively unlawful and he or she is entitled to relief from it." *Id.* at

8   1418. A petition for review to the California Supreme Court was granted in *Kirchner* on May 18,

9   2016. A week prior, in *People v. Berg*, 2016 WL 2854322 (Cal. Ct. App. May 12, 2016), the

10   California Court of Appeal ordered the resentencing of a juvenile who was convicted of murder as

11   a teenager and sentenced to LWOP because the record did not reflect that the sentencing court

12   considered, as is required by *Miller* and *Gutierrez*, whether the crime "reflect[ed] transient

13   immaturity or irreparable corruption[.]" *Berg*, 2016 WL 2854322, at \*7 (citations and alterations

14   omitted). The Court of Appeal in *Berg* reasoned:

15         Rather than considering Berg's youth in determining whether he was
16         the "rare juvenile offender whose crime reflects irreparable
         corruption[,]" the sentencing court considered Berg's youth in the
17         context of determining whether, as the sentencing court stated, the
         "aggr[a]vants outweigh the mitigants." Thus, it is clear that in
18         imposing an LWOP sentence on Berg, the trial court did not
         exercise its discretion "in accordance with *Miller*," as is required.

19   *Id.* (citations and internal quotation marks omitted). The Court further noted that "given

20   that Berg was sentenced prior to the decisions in *Mille*r and *Gutierrez*, the record does not reflect

21   that the sentencing court considered all relevant evidence related to whether the court could

22   lawfully impose an LWOP sentence on Berg." *Id.* (citation omitted).

23      In short, because petitioner was told by the California Supreme Court that he could file an

24   original habeas petition following that Court's decision in *Gutierrez*, and because petitioner has

25   yet to file that petition and potential state remedies appear available to him, this Court will *sua*

26   *sponte* stay its resolution of this issue pending petitioner's exhaustion of this claim in the

27   appropriate state court. *See* Dkt. No. 7.

28      After he exhausts state court remedies for his Eighth Amendment challenge to his

1    sentence, petitioner should move to lift the stay so that this court may adjudicate the Eighth

2    Amendment claim.  When he moves to lift the stay, petitioner must file a copy of his petition to

3    the California Supreme Court in which he raises the Eighth Amendment claim, as well as a copy

4    of the California Supreme Court's decision on the claim.  Once the stay is lifted, this Court will set

5    a briefing schedule for any supplemental argument about the Eighth Amendment claim.  Petitioner

6    is encouraged to act diligently to get back to state court, and then to return to federal court after

7    exhausting his state court remedies.  (If petitioner obtains satisfactory relief regarding his sentence

8    from a lower state court, or wishes to abandon the Eighth Amendment claim, he must promptly

9    file a motion to lift the stay so that this Court can enter judgment on his petition.)

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED as to all claims except for petitioner's Eighth Amendment claim regarding his sentence.

This action is now STAYED so that petitioner may file an appropriate petition or action in state court to challenge his sentence.  The clerk shall ADMINISTRATIVELY CLOSE the case. After petitioner exhausts state court remedies as to his Eighth Amendment claim regarding his sentence, he may then return to this court and move for an order to lift the stay and reopen this action so that his Eighth Amendment claim may be adjudicated.

**IT IS SO ORDERED.**

Dated: June 9, 2016

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California